PEOPLE v McLEMORE

Docket Nos. 77-4827, 78-41, 78-115. Submitted June 5, 1979, at Detroit.—Decided February 21, 1980.

Defendant, Harold McLemore, was convicted in Federal court in 1969 of armed bank robbery and sentenced to serve a prison term in a Federal prison. After serving slightly more than half of the sentence the defendant was scheduled for parole and was transferred to the Community Treatment Center in Detroit in 1975 or 1976 to prepare him for his release. After his transfer to Detroit, but before the completion of his period of residence at the Center and before the effective date of his parole, he walked away from the Center and allegedly committed the acts that led to his arrest. He was arrested in Detroit on July 28, 1976, by agents of the Federal Bureau of Investigation on Federal charges and was simultaneously arrested by local authorities on a state charge of carrying a concealed weapon. He was turned over to the Detroit Police for an investigation which resulted in charges of three counts of first-degree murder and one count of assault with intent to commit murder. The defendant had previously been charged with a separate count of carrying a concealed weapon. On August 1, 1976, the defendant was returned to Federal custody and was held as a marshal's prisoner in the Detention Unit of the Federal Correctional Institution at Milan, Michigan. The defendant was then transferred between Milan and the Wayne County Jail on several occasions for proceedings applicable to the state charges pursuant to writs of habeas corpus ad prosequendum issued by judges of Detroit Recorder's Court. In the fall of 1976, trial on the two concealed weapons charges was postponed pending disposition of the murder and assault charges. The record

REFERENCES FOR POINTS IN HEADNOTES

[1, 8] 31 Am Jur 2d, Extradition §§ 3 - 5.
    Validity, construction, and application of Interstate Agreement on Detainers. 98 ALR3d 160.
[2] 31 Am Jur 2d, Extradition § 14 et seq.
[3] 31 Am Jur 2d, Extradition § 20.
[4-7] 39 Am Jur 2d, Habeas Corpus § 2.

indicates that if defendant was found guilty on the murder and assault charges, the concealed weapons charges would be dropped. Before trial could be had on any of the charges, the defendant moved for dismissal of the charges for the prosecution's failure to comply with the 120-day rule of the Interstate Agreement on Detainers. The motions were granted between March and August of 1977 in Recorder's Court of Detroit, Samuel Gardner and George W. Crockett III, JJ. The prosecution appeals by leave granted, alleging that the Interstate Agreement on Detainers is inapplicable to the instant case. The cases were consolidated on appeal. *Held:*

1. The prosecution focuses on the fact that no detainer was ever lodged against the defendant, but that he was transferred to Detroit from the Federal facility in Milan pursuant to writs of habeas corpus ad prosequendum. However, the use of the ad prosequendum writ results in the same disruption of a prisoner's rehabilitation programs that the Agreement on Detainers was designed to prevent. For purposes of the Agreement a writ of habeas corpus ad prosequendum is the equivalent of a detainer. Since the state writ of habeas corpus ad prosequendum is effective in another jurisdiction only because of the Agreement, a state should not be allowed to avoid the Agreement through the use of the writ.

2. The writ of habeas corpus ad prosequendum is not expressly authorized in Michigan by any statute or court rule, but neither is it prohibited. Thus the judges of Detroit Recorder's Court have the authority to issue the writ. Such a writ, however, can only be effectively utilized if it extends to "any prisoner who is detained in any jail or prison within this state".

3. Despite the fact that the state ad prosequendum writs issued in this case were of independent effect and not obeyed solely because of the existence of the Agreement, the Agreement applies to this case. The Agreement provides the exclusive means by which a state jurisdiction may obtain the prisoner of another jurisdiction for trial. Thus, if the defendant was detained as a marshal's prisoner for over a year solely so that he might be shuttled back and forth between Detroit and Milan for proceedings relevant to pending state charges, he will have been denied re-entry into the program of rehabilitation he would have been afforded through return to the general prison population and the jurisdiction of the Federal Bureau of Prisons. If he was held in this manner for more than the statutorily allowed 120 days, the evils which the agreement seeks to eliminate will have occurred and the trial courts will have been

correct in dismissing the charges under the authority of the Agreement.

4. As to the first of the two concealed weapons charges, dismissal was improper. A pre-trial conference was held on November 4, 1976, after an earlier adjournment. At that time, trial on this charge was adjourned until the murder and assault charges could be resolved. The record reflects that if the defendant was found guilty of the murder and assault charges, all concealed weapons charges would most likely be dropped. The record also reflects that the defendant's counsel was present at the conference and that he agreed to the adjournment. This adjournment was a necessary or reasonable continuance that tolled the running of the 120-day period, established by the Agreement, for bringing the defendant to trial on that charge. At that time only 97 of the 120 days had elapsed.

5. On the second concealed weapons charge, a remand is necessary for further findings of fact. It is clear that the time periods specified in the relevant portions of the Agreement do not begin to run until the defendant is brought to the receiving jurisdiction pursuant to a request by the prosecution. If after an evidentiary hearing it appears that the defendant was not transferred to Detroit Recorder's Court pursuant to process triggering the running of the applicable time periods of the Agreement before November 4, 1976, the order of March 11, 1977, dismissing this charge shall be reversed. If, on the other hand, it does appear that the defendant was produced in the trial court pursuant to a detainer or a writ of habeas corpus directed to Federal authorities prior to November 4, 1976, then the trial court shall determine whether a period of 120 days elapsed between such production and November 4, 1976, with allowance made for any necessary or reasonable continuances granted in the presence of the defendant or his counsel. If the trial court finds that 120 days did not expire in this period, the order of March 11, 1977, shall be deemed improper. If 120 days did expire in this period, the order shall be deemed affirmed. The period of time between November 4, 1976, and March 11, 1977, is construed as a reasonable continuance, as with the other concealed weapons charge, and is excused under the Agreement.

6. The defendant first appeared in Recorder's Court on the first-degree murder and assault charges on August 6, 1976, when he was in Federal custody. A preliminary examination was held on August 16, 1976, and the defendant was bound over for trial. It appears that in the early stages of the investigation the defendant was offered

immunity from prosecution in exchange for his testimony against his codefendants. This bargain was later revoked. The 120-day period of the Agreement was tolled during the time that the parties assumed no prosecution would take place under a grant of immunity. However, the record does not indicate exactly when any such periods existed. As a result, this matter is remanded to the trial court for findings of fact to determine if and for how long at any point after defendant's arraignment on August 6, 1976, the running of the 120-day period was tolled by the reasonable assumptions that the defendant would not be tried due to a grant of immunity. The stay of proceedings ordered by the trial court pending appeal of a suppression order was a reasonable continuance excusing the time period between January 19, 1977, and April 4, 1977, the day the Court of Appeals denied leave. Excluding these periods, the trial court shall determine if more than 120 days of unexcused delay expired between August 6, 1976, and June 23, 1977, the date of the defendant's motion to dismiss.·

7. The defendant's return to the Federal facility at Milan after attendance at proceedings in Recorder's Court was not a return to the 'original place of imprisonment' since the Agreement specifically allows a Federal prisoner to appear in state court while remaining in Federal custody, and since the defendant did not have any rehabilitative programs to be interrupted while at Milan. Thus, the motivating policies behind another portion of the Agreement were not violated in this case.

8. The defendant's claims of a denial of his right to a speedy trial were not resolved in the trial court. The defendant may raise his speedy trial claims when the prosecutions are reinstated.

Reversed in part and remanded.

1. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — FEDERAL PRISONERS — STATE TRIAL — STATUTES.

Physical custody of a prisoner does not have to change hands for the Interstate Agreement on Detainers to be applicable when a Federal prisoner is involved; the agreement specifically provides that a Federal prisoner may be brought to the place of the state trial while remaining in Federal custody (MCL 780.601; MSA 4.147[1]).

2. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — STATUTES.

The Interstate Agreement on Detainers does not apply unless a

prisoner is actually serving a term of imprisonment (MCL 780.601 *et seq.;* MSA 4.147[1] *et seq.*).

3. CRIMINAL LAW — FEDERAL PRISONERS — STATUTES.

A Federal prisoner, even if paroled, remains in the legal custody of the United States Attorney General until the expiration of the prisoner's term of imprisonment (18 USC 4210[a]).

4. HABEAS CORPUS — HABEAS CORPUS AD PROSEQUENDUM — INTERSTATE AGREEMENT ON DETAINERS — STATUTES.

A writ of habeas corpus ad prosequendum issued by a state court is the equivalent of a detainer for the purpose of the Interstate Agreement on Detainers (MCL 780.601 *et seq.;* MSA 4.147[1] *et seq.*).

5. HABEAS CORPUS — HABEAS CORPUS AD TESTIFICANDUM — COURT RULES.

Michigan statutes and court rules refer to only two varieties of habeas corpus writs; a writ to inquire into the cause of detention (the traditional writ) and a writ to produce a prisoner detained in this state to be examined as a witness (habeas corpus ad testificandum); each writ differs as to the scope of its jurisdiction (GCR 1963, 712, 713).

6. HABEAS CORPUS — HABEAS CORPUS AD PROSEQUENDUM — COURTS — CONSTITUTIONAL LAW — STATUTES.

The writ of habeas corpus ad prosequendum is not expressly authorized in Michigan by any statute or court rule, but neither is it prohibited; circuit court and Detroit Recorder's Court judges have the authority to issue the ad prosequendum writ (Const 1963, art 6, § 13, MCL 600.601; MSA 27A.601).

7. HABEAS CORPUS — HABEAS CORPUS AD PROSEQUENDUM — COURT RULES.

A writ of habeas corpus ad prosequendum can only be effectively utilized if it extends to "any prisoner who is detained in any jail or prison within this state" (GCR 1963, 713.1[2][a]).

8. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS.

The Interstate Agreement on Detainers is the exclusive means by which a state court in Michigan may obtain a prisoner of another jurisdiction for trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward R. Wilson,* Principal

Attorney, Appeals, and *Timothy C. Scallen,* Assistant Prosecuting Attorney, for the people.

*Norman R. Robiner,* for defendant in No. 77-4827, *Sheldon Halpern (Eileen R. Scheff,* of counsel), in No. 78-41, and *Rolf E. Berg,* Assistant State Appellate Defender, in No. 78-115.

Before: R. M. Maher, P.J., and Bronson and A. E. Moore,* JJ.

Per Curiam.

## I.

The prosecution appeals by leave granted from three separate orders dismissing various criminal charges then pending against the defendant. In the cases with docket numbers 78-41 and 78-115, defendant was charged with carrying a concealed weapon (CCW), MCL 750.227; MSA 28.424, and in the case with docket number 77-4827 he was charged with three counts of first-degree murder, MCL 750.316; MSA 28.548, and one count of assault with intent to commit murder, MCL 750.83; MSA 28.278. All charges were dismissed with prejudice, mainly for failure to comply with the 120-day rule of Article IV(c) of the Interstate Agreement on Detainers, MCL 780.601 *et seq.;* MSA 4.147(1) *et seq.* (hereinafter Agreement).[1] Alterna-

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] Dismissal in docket number 78-41 was alternatively based on violation of the 180-day rule of MCL 780.131; MSA 28.969(1). On appeal, both parties concede that reliance on this statute was misplaced. The prosecution argues this is so because defendant was at all times a Federal prisoner. The defendant does not concede this specific point, and argues instead that the statute is inapplicable because he was not incarcerated in a Michigan penal institution pursuant to a state conviction. In any event, we agree that MCL 780.131; MSA 28.969(1) is not applicable to the instant case.

tive arguments are, however, advanced by defendant to support the trial courts' dismissals, including general speedy-trial requirements, and violation of Article IV(e) of the Agreement, which requires trial before return to the original place of imprisonment.

This appeal presents complex legal questions concerning the Agreement, and an equally complex factual setting. Defendant was convicted in Federal court in late 1969 of armed bank robbery, sentenced in July of 1970 to a prison term of ten years, and began serving his sentence at the Federal Correctional Institution at Terre Haute, Indiana. After serving slightly more than half of this sentence, he was scheduled for parole and transferred to the Community Treatment Center in Detroit sometime in 1975 or 1976 to prepare him for release. At some point after his return to Detroit, but before the completion of his period of residence at the Center and before the effective date of his parole, he walked away from the Center and undertook the acts that led to his arrest, and ultimately to this appeal.[2] He was arrested in Detroit on July 28, 1976, by agents of the Federal Bureau of Investigation on Federal charges[3] and was simultaneously arrested by local authorities

[2] Defendant was later recaptured and charged with escape by Federal authorities. The escape charge was eventually dismissed for Federal inaction. *United States v McLemore,* 447 F Supp 1229 (ED Mich, 1978). The Federal District Court's opinion in that case indicates that defendant was transferred from Terre Haute to the Community Treatment Center in Detroit during March of 1976, pending a July 8, 1976, release date, but that he walked away from the Center on April 7, 1976. This presents some confusion, since the record before us indicates defendant was arrested on the other CCW charge (docket number 78-115) on November 2, 1975, at a time when defendant was presumably still in Terre Haute, and more than five months before his alleged escape from the Center.

[3] Defendant was charged with escape from a Federal penal facility, 18 USC 751, and with the illegal possession of a firearm, 18 USC (Appendix) 1202(a)(1).

on the state CCW charge (docket number 78-41). He was turned over to the Detroit Police for an investigation that evolved into the murder and assault charges (docket number 77-4827). On August 1, 1976, he was returned to Federal custody and held as a marshal's prisoner in the Detention Unit of the Federal Correctional Institution at Milan, Michigan.[4] He was then transferred between Milan and the Wayne County Jail on several occasions for proceedings relevant to the state charges pursuant to writs of habeas corpus ad prosequendum issued by judges of Detroit Recorder's Court. Although defendant's Federal parole had been retarded on April 26, 1976, no further action was taken by Federal authorities to formally revoke his parole or indict him for escape until August of 1977, after all state charges had been dismissed and defendant returned to the general prison population at Terre Haute.[5] It is

---

[4] The status of a marshal's prisoner was described by Judge Philip Pratt of the United States District Court for the Eastern District of Michigan in *United States v McLemore, supra*, 1231, fn 3:

" 'Marshal's prisoners' are segregated from the general prison population. Prisoners are generally committed to the custody of the United States Marshal for a limited and particular purpose, as, for instance, to await trial or to participate in a legal proceeding in some other capacity. Since no other 'jail' facilities are available to the Marshal in this District, a section of the Milan FCI (the nearest available federal facility) has been utilized by him under an agreement with the Bureau of Prisons. What results is that in this District, Marshal's prisoners, although lodged at a federal correctional institution, are not in the custody of the Bureau of Prisons." The opinion further states, at 1232:

"Marshal's prisoners are designated as such and, as such, they are either denied all access to various facilities, equipment, counseling services, and educational, recreational and other developmental programs, or they are afforded far more restricted opportunity to avail themselves of those facilities, services and programs than are the members of the general prison population. In brief, incarceration at the Detention Unit should not be confused with the usual beneficial incidents of regular inmate status one associates with a federal correctional institution. Under the control of the Marshal, defendant was confined in a jail-type environment."

[5] Defendant was indicted on the Federal charges on August 5, 1977,

not necessary at this stage to relate all the details of the state proceedings between August of 1976 and August of 1977. It does appear, however, that in the fall of 1976, trial on the two CCW charges was postponed pending disposition of the murder and assault charges. The record reflects that if defendant was found guilty on the murder and assault charges, the CCW charges would be dropped. The record also alludes to another agreement whereby defendant would testify against others in the murder trial, in exchange for immunity. This second agreement was proposed at an earlier stage in the proceedings, and apparently fell through.[6] It is also seemingly unrelated to the postponement of the CCW charges. Before the trial could be had on any of the charges, defendant moved for dismissal and the motions were granted between March and August of 1977.

## II.

The Interstate Agreement on Detainers evolved as a solution to the adverse effects produced by the lodging of detainers against prisoners based on untried indictments, complaints and informations. It was apparent to many involved in the administration of criminal justice that when a detainer was lodged by one jurisdiction against a prisoner in another jurisdiction, rehabilitative programs suffered through the anxiety and uncertainty expe-

and arraigned on September 7, 1977. He was returned to Terre Haute on August 12, 1977, and brought before a panel of the United States Parole Commission on August 24. The panel announced its decision on September 19, 1977.

[6] Defendant contends that the prosecution was responsible for the collapse of the agreement, by formally charging him with murder after promising him immunity. The prosecution charges defendant revoked the agreement when he failed to comply with the requirement that he undergo a polygraph examination and when he moved to suppress a confession involving the murder case.

rienced by the prisoner and through the denial of access to various prison programs and other privileges such as good-time and parole. These results often flowed automatically from the lodging of a detainer, despite the fact that a large percentage of detainers were never acted on by the issuing jurisdiction. The abuses to which detainers were subject are described by the United States Supreme Court in *United States v Mauro,* 436 US 340; 98 S Ct 1834; 56 L Ed 2d 329 (1978). See also, *United States ex rel Esola v Groomes,* 520 F2d 830 (CA 3, 1975).

In an attempt to remedy these abuses and aid rehabilitative programs, formal efforts began in 1948 to develop a means by which one jurisdiction could expeditiously transfer prisoners to another for resolution of pending charges. To be effective, the agreement had to be national in scope and had to avoid the often cumbersome proceedings associated with formal extradition. These efforts produced a draft of the Agreement issued under the auspices of the Council of State Governments, and in 1956 the draft was approved and included in the Council's Suggested State Legislation Program for 1957. A majority of the jurisdictions in this country now have enacted the Agreement, including Michigan and the United States.[7]

The background of the Agreement is reflected in its first article, which states:

"The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and

[7] MCL 780.601 *et seq.;* MSA 4.147(1) *et seq.,* 18 USC Appendix.

the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints. The party states also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of co-operative procedures. It is the further purpose of this agreement to provide such co-operative procedures."

Article III of the Agreement provides a method by which a prisoner against whom a detainer has been lodged is given notice of the detainer and allowed to request final disposition of the pending charges. After the prisoner complies with the appropriate notice requirements, trial must be had within 180 days. Article IV provides the means by which a jurisdiction that has untried charges against the prisoner of another jurisdiction can secure the attendance of the prisoner for trial. Under Article IV trial must be had within 120 days of the arrival of the prisoner and before the return of the prisoner to the original place of imprisonment. Articles III and IV both provide for the tolling of the time periods by the grant of reasonable continuances in open court and in the presence of defendant or counsel.

### III.

On appeal, the prosecution strongly argues that the Agreement is not applicable to the instant case. Several reasons are advanced in support of this conclusion. The argument that the Agreement does not apply because no change of custody actually took place is without merit. The record reflects that on several occasions defendant was lodged in the Wayne County Jail. In any event,

physical custody does not have to change hands when a Federal prisoner is involved. Article V(a) specifically provides that a Federal prisoner may be brought to the place of trial while remaining in Federal custody. The prosecution's alternative argument, that the Agreement is inapplicable because the defendant was merely awaiting trial and not serving a sentence, must also fail. It is clear that a prisoner who is in custody solely pending prosecution on criminal charges does not yet have a program of rehabilitation to be disrupted. Consistent with its purposes, the Agreement does not apply unless the prisoner is actually serving a term of imprisonment. *United States v Roberts,* 548 F2d 665, 669-671 (CA 6, 1977). While the defendant's incarceration at Milan was related to pending Federal charges, he was still under a sentence for the 1969 armed bank robbery conviction that will not expire until the middle of 1980. Even if paroled, a Federal prisoner remains in the legal custody of the United States Attorney General until the expiration of his term. 18 USC 4210(a). In the instant case, after dismissal of pending state charges, the defendant was returned to Terre Haute for action on his parole. It appears that he remains in Terre Haute serving the remainder of his Federal sentence. Accordingly, the defendant remained at all times relevant to these proceedings under a prison sentence.

The prosecution's most forceful argument concerning the inapplicability of the Agreement focuses on the fact that no detainer was ever lodged against the defendant. Instead, he was transferred to Detroit from Milan pursuant to writs of habeas corpus ad prosequendum issued by Detroit Recorder's Court judges. Several courts have recognized that allowing the prosecution to use the ad prose-

quendum writ instead of a detainer would result in the same disruption of rehabilitative programs that the Agreement was designed to prevent. This Court has adopted this logic, and held that a writ of habeas corpus ad prosequendum is the equivalent of a detainer for the purposes of the Agreement. *People v Beamon,* 83 Mich App 121, 132; 268 NW2d 310 (1978), *lv den* 403 Mich 850 (1978).

This same issue resulted in a split amongst the Federal Circuit Courts of Appeal that has only recently been resolved by the United States Supreme Court. In *United States v Mauro,* 436 US 340; 98 S Ct 1834; 56 L Ed 2d 329 (1978), the Court held that a *Federal* writ of habeas corpus ad prosequendum is not the equivalent of a detainer for the purposes of the Agreement. In reaching its decision, the Court noted that the primary problem presented by the use of detainers was the fact that they remained lodged against a defendant for a long period of time without the necessity of any action being taken. Since the Federal writ is executed immediately, the Court was of the opinion that these problems were not presented through use of the writ. The Court additionally noted that express statutory authorization exists for the Federal writ,[8] and that due to its long history, dating back to the First Judiciary Act, Congress could be presumed to have been familiar with the writ when enacting the Agreement. Because the writ was not seen as presenting the same problems as a detainer, the Court concluded that use of the writ did not amount to government circumvention of the Agreement.

Critical to the Court's holding in *Mauro* was the nature of the Federal ad prosequendum writ. Unlike a state writ of habeas corpus ad prosequen-

---

[8] 28 USC 2241(c)(5).

dum, which has effect only within the jurisdiction of the issuing court, the Federal writ is effective nation-wide and allows the Federal government to obtain prisoners from every state. Accordingly, *Mauro* does not require a change in this Court's interpretation of the Agreement as expressed in *Beamon.*[9] A state ad prosequendum writ, directed outside the jurisdiction of the issuing court, need not be honored. The Agreement, however, provides the party states with an effective method of receiving custody, so that there is no point in another jurisdiction refusing to obey a state writ of habeas corpus ad prosequendum. The state could simply come back with the identical or a substantially similar document labeled as a detainer and get custody of the prisoner. The only reason for another jurisdiction to obey a state ad prosequendum writ is that the writ is backed up by the other jurisdiction's obligations under the Agreement. See *United States ex rel Esola v Groomes,* 520 F2d 830 (CA 3, 1975), *Gray v Benson,* 443 F Supp 1284, 1288-1289 (D Kan, 1978). Because the state writ is effective only on account of the Agreement, a state should not be allowed to avoid the Agreement through the use of the writ.

IV.

In reaching a decision in the instant case, we must take the analysis one step further. The writs issued in this case were directed to the United States Marshal at Milan, Michigan, and concerned a prisoner held at that place. It is thus arguable

---

[9] The issue of *Mauro's* effect on *Beamon* has reached this Court, but the panel found it unnecessary to resolve the issue. *People v Estelle,* 93 Mich App 449; 287 NW2d 262 (1979), *People v Barnes,* 93 Mich App 509; 287 NW2d 282 (1979). One judge did reach the issue, and found that *Mauro* overruled the holding in *Beamon. People v Barnes, supra,* T. M. BURNS, J., concurring.

that the writs were issued within the jurisdiction of the issuing Court, and as such were required to be obeyed, obviating the argument that they should be considered detainers because they were honored solely on account of the Agreement.

Unlike the Federal statute,[10] the Michigan statutes[11] and court rules[12] refer to only two varieties of habeas corpus writs; a writ to inquire into the cause of detention (the traditional writ) and a writ to produce a prisoner detained in this state to be examined as a witness (habeas corpus ad testificandum).[13] Each writ differs as to the scope of its jurisdiction. By virtue of sub-rule GCR 1963, 712.1(1), a writ of habeas corpus to inquire into the cause of detention is brought in the Detroit Recorder's Court when the prisoner is detained in the City of Detroit. An ad testificandum writ, on the other hand, may be issued by any court of record[14] directing the production of "any prisoner who is detained in any jail or prison within this state". GCR 1963, 713.1(2)(a).

The writ of habeas corpus ad prosequendum is not expressly authorized in Michigan by any statute or court rule, but neither is it prohibited. We accordingly concede that the judges of the Detroit Recorder's Court have the authority to issue the ad prosequendum writ. Rather than specifically delineating the scope of jurisdiction granted to courts of record, the Michigan Constitution and provisions of the Revised Judicature Act confer a

[10] 28 USC 2241.

[11] MCL 600.4301-600.4387; MSA 27A.4301-27A.4387.

[12] GCR 1963, 712, 713.

[13] MCL 600.4385; MSA 27A.4385, GCR 1963, 713.

MCL 600.4319; MSA 27A.4319 provides for a writ of habeas corpus in child custody matters, but the court rule requires the initial use of a show cause order. GCR 1963, 712.14.

[14] Including the Detroit Recorder's Court. See MCL 726.17; MSA 27.3567.

broad jurisdiction, subject only to exceptions provided in the Constitution, statutes, and court rules. Const 1963, art 6, § 13 provides in part: "The circuit court shall have original jurisdiction in all matters not prohibited by law; * * * power to issue, hear and determine prerogative and remedial writs * * *." Similarly, MCL 600.601; MSA 27A.601 states:

"Circuit courts have the power and jurisdiction (1) possessed by courts of record at the common law, as altered by the constitution and laws of this state and the rules of the supreme court, and (2) possessed by courts and judges in chancery in England on March 1, 1847, as altered by the constitution and laws of this state and the rules of the supreme court, and (3) prescribed by rule of the supreme court."[15]

Granting that the authority existed for the issuance of the writs in the instant case, we would also hold that the writs were effective when directed to the United States Marshal at Milan concerning a Federal prisoner detained there. The ad prosequendum writ is more like the ad testificandum writ than the general habeas corpus writ to inquire into the cause of detention. It can only be effectively utilized if it extends to "any prisoner who is detained in any jail or prison within this state". See GCR 1963, 713.1(2)(a).

## V.

Despite the fact that we find the state ad prosequendum writs issued in this case were of independent effect and not obeyed solely because of the existence of the Agreement, we hold the Agreement applies to this case. Unlike the situation in

---

[15] See note 14, *supra*.

*Mauro,* the Michigan writ of habeas corpus ad prosequendum is not expressly mentioned in any of the statutes or court rules so that we cannot assume, as did the United States Supreme Court, that the Legislature was aware of the writ as an alternative means of securing for trial Federal prisoners held within this state. Additionally, while the Court in *Mauro* primarily grounded its decision on the assumption that since Federal habeas corpus ad prosequendum writs are immediately executed they avoid the problems the Agreement sought to relieve, we do not as easily reach this conclusion.[16] The state writ, as is the Federal writ, is executed immediately. In this manner, some of the concerns that resulted in the Agreement are not present when the writ is used in place of a detainer. For example, some action will be taken immediately on the writ, while the detainer could, before the Agreement, remain lodged against a defendant without the necessity of any action ever taking place. The Agreement does, however, express a more general legislative concern about the adverse effects of pending charges in another jurisdiction on a prisoner's rehabilitative program. To this end, the Agreement provides a means by which the prisoner can initiate proceedings to dispose of untried charges, but it also provides that when the jurisdiction itself moves to resolve the untried charges, it must do so within a specified period of time so that the prisoner's existing program of rehabilitation is not unduly interrupted. These concerns are amply demon-

---

[16] The decision of the United States Supreme Court in *Mauro* involved the interpretation of a Federal statute. We are here involved with the interpretation of an identical state statute. As such, the *Mauro* decision should be looked on as providing guidance, but it is not controlling and we are free to reach a different conclusion based on the Michigan statute and the different nature of the state *ad prosequendum* writ.

strated by the instant case. It is apparent from the record that the defendant was held as a marshal's prisoner at Milan for over a year solely so that he might be shuttled back and forth between Detroit and Milan for proceedings relevant to pending state charges. He was not returned to Terre Haute until the last of the state charges were dismissed, and no action was taken by Federal authorities on his Federal parole or his pending Federal charges until the dismissal of the state charges. If no state charges were ever lodged against the defendant, it appears to us that he would have been returned to the general prison population at Terre Haute and action taken by Federal authorities at a much earlier date. By holding the defendant as a marshal's prisoner in Milan, and transferring him back and forth pursuant to ad prosequendum writs, he was denied re-entry into the program of rehabilitation he would have been afforded through return to the general prison population and the jurisdiction of the Federal Bureau of Prisons. We suspect that it is this sort of reasoning that has led some courts to conclude that the Agreement provides the exclusive means by which a jurisdiction may obtain the prisoner of another jurisdiction for trial. *United States ex rel Esola v Groomes, supra, Gray v Benson, supra,* 1288, and cases cited therein. While the exclusive means rationale can no longer be considered viable in light of *Mauro* when the Federal government is seeking production of a state prisoner, it continues to remain persuasive when a state is seeking production. See *Gray v Benson, supra,* 1288. If, then, the defendant was detained in this manner for more than the statutorily allowed 120 days, the evils which the Agreement seeks to eliminate will have occurred, and the trial judges will have been correct in dismissing the charges under the authority of the Agreement.

## VI.

Having reached the conclusion that the Agreement applies, we must next determine if its provisions were violated. Article IV(c) of the Agreement provides:

"In respect of any proceeding made possible by this Article, trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

We will analyze the facts of each of the three cases in turn to determine if the Agreement was violated.

### A. 78-41

The defendant first appeared in Recorder's Court on the CCW charge contained in docket number 78-41 (lower court docket number 76-05790) on July 30, 1976, when he was arraigned on the warrant. Defendant was at this time in the custody of Federal authorities. On August 6, 1976, he waived examination, was bound over for trial, and arraigned on the information. A pre-trial conference was held on August 13, 1976, at which the prosecution requested adjournment of the matter pending resolution of the murder and assault charges against the defendant. A second pre-trial conference was set for October 26, 1976, but adjourned. The second conference was ultimately held on November 4, 1976, and after conducting a hearing on the matter the trial court adjourned the trial until the murder and assault charges could be resolved. The record reflects that if the

defendant were found guilty of the murder and assault charges, all CCW charges pending against the defendant would most likely be dismissed. The record also reflects that defendant's counsel was present at the November 4 conference and that he agreed to the adjournment. We construe this adjournment as a necessary or reasonable continuance that tolled the running of the 120-day period. At the time of the adjournment, 97 days had elapsed since July 30, 1976, the date on which the defendant first appeared (in Federal custody) before the trial court on this matter.

The pending murder and assault charges were not resolved until after the CCW charges were dismissed. As a result, the 120-day period never began to run again. Because at the time of dismissal only 97 days of unexcused delay had passed, we hold the trial court erred in dismissing the CCW charges against the defendant contained in docket number 78-41.

### B. 78-115

The record in docket number 78-115 (lower court docket number 75-08415) shows that the defendant was arrested, charged with CCW, and arraigned on the warrant on November 2, 1975. He waived examination, was bound over, and arraigned on the information on November 17, 1975. A pre-trial conference was held on November 24, 1975, and, on November 26 of the same year, trial was set for January 15, 1976. Nothing else appears in the record until November 10, 1976, when a new trial date was set for January 19, 1977.

This case must be remanded to the trial court for further fact-finding. It is clear that the time periods specified in Article IV of the Agreement do not begin to run until the defendant is brought to

the receiving jurisdiction pursuant to a request by the prosecution. It does not appear that the defendant was brought to Recorder's Court from Federal authorities until November 4, 1976, for a pretrial conference. If this was indeed the first time defendant was brought before the trial court pursuant to a request that triggers Article IV, then the same analysis would apply as in docket number 78-41 and the trial court would have been in error in dismissing the charges. As we have noted above, however, defendant's status as a Federal prisoner between November 2, 1975, the date of his arrest on the CCW charge in docket number 78-115, and July 28, 1976, the date of his arrest in Detroit by FBI agents, is in doubt. The trial court is instructed to conduct an evidentiary hearing on this matter. If after a hearing it appears that the defendant was not transferred to Detroit Recorder's Court pursuant to process triggering Article IV of the Agreement before November 4, 1976, the trial court's order of March 11, 1977, dismissing the charge contained in our docket number 78-115 shall be deemed reversed. If, on the other hand, it does appear that the defendant was produced in the trial court pursuant to a detainer or a writ of habeas corpus directed to Federal authorities prior to November 4, 1976, then the trial court shall determine whether a period of 120 days elapsed between such production and November 4, 1976, with allowance made for any necessary or reasonable continuances granted in the presence of defendant or his counsel. If the trial court finds that 120 days did not expire in this period, the order of March 11, 1977, shall also be deemed reversed. If 120 days did expire in this period, the order shall be deemed affirmed. As in our analysis of docket number 78-41, we construe the period of time between November 4, 1976, and March 11, 1977, as

a reasonable continuance and, as such, excused under Article IV(c).

## C. 77-4827

The defendant first appeared in Recorder's Court on the charges contained in docket number 77-4827 (lower court docket number 76-05898) on August 6, 1976, when he was arraigned on the warrant. Defendant was at this time in Federal custody. Preliminary examination was held August 16, 1976, and defendant was bound over for trial. It appears that at some point in the investigation of this case, most likely during the early investigatory stages, defendant was offered immunity from prosecution in exchange for his testimony against his codefendants. It also appears that at some stage of the proceedings this bargain was revoked. Any running of the periods specified in Article IV of the Agreement would necessarily be tolled during that time when the parties assumed no prosecution would take place under a grant of immunity. We are unable to determine, on the record before us, exactly when any such periods existed. We particularly note that the record does not contain a transcript of the hearing held July 12, 1977, at which defendant's motion to dismiss was granted.[17] As a result, this matter is remanded to the trial court for findings of fact to determine if and for how long at any point after defendant's arraignment on August 6, 1976, the running of the 120-day period was tolled by the

[17] As a result we are also unable to pass on defendant's claim that his motion to dismiss was granted on account of the prosecution's alleged breach of the agreement by which he was to be granted immunity, rather than for violation of the Agreement. We can note only that defendant's motion to dismiss sets forth as alternative grounds breach of the immunity bargain and violation of the Agreement.

parties' reasonable assumptions that the defendant would not be tried due to a grant of immunity. We construe the stay of proceedings ordered by the trial court pending appeal of the suppression order as a reasonable continuance excusing the time period between January 19, 1977, and April 4, 1977, the date this Court denied leave.[18] Excluding these periods, the trial court shall determine if more than 120 days of unexcused delay expired between August 6, 1976, and June 23, 1977, the date of the defendant's motion to dismiss. If the trial court finds that 120 days did elapse during this time, the order granting defendant's motion to dismiss will be deemed affirmed. If less than 120 days of such unexcused delay passed, the order of the trial court shall be deemed reversed.

We note that this case presents a somewhat different situation than do the two CCW cases. In those cases, specific adjournments were granted pending the outcome of this case, apparently on the assumption that they would not continue should defendant be found guilty of the murder and assault charges. In this case, no such adjournment was granted, so that the 120-day period ran from the August 6, 1976, inception of the case until the June 23, 1977, motion to dismiss, with allowance for the necessary and reasonable continuances noted above.

## VII.

We have concentrated on Article IV(c) of the Agreement because we do not believe that Article IV(e) is applicable to this case. Article IV(e) requires dismissal when trial is not had before the prisoner's return to the "original place of impris-

---

[18] See note 6, *supra*.

onment". In the circumstances of this case, defen-
dant's argument is that when he was returned to
Milan after his attendance at proceedings in De-
troit, he was returned to the "original place of
imprisonment".

We disagree. First, we note that Article V(a) of
the Agreement allows a Federal prisoner to be
brought to a state court for trial while remaining
in Federal custody. It would be illogical to assume
that this would be an allowable practice if a
prisoner's nightly return to any Federal facility
amounted to a return to the "original place of
imprisonment". Secondly, however, and more im-
portantly, we interpret Article IV(e) as primarily
concerned with the interruption of ongoing reha-
bilitation programs that a continued shuttling
between a facility offering such programs and a
facility that did not would represent. See *People v
Estelle*, 93 Mich App 449; 287 NW2d 262 (1979).[19]
As a marshal's prisoner at Milan, the defendant
was held in a jail-type situation. He was segre-
gated from the general prison population and was
not under the jurisdiction of the Bureau of Pris-
ons. As a result, defendant was not engaged in any
on-going rehabilitative program. Despite the fact
that defendant apparently spent some time in the
Wayne County Jail on at least two occasions, his
temporary absence from, and subsequent return
to, the marshal's detention area at Milan had no
effect on defendant's ability to participate in reha-
bilitative programs. We will not reach out to find a
violation of Article IV(e) where the motivating
policies of that article have not been violated.[20]

[19] See also, *People v Barnes*, 93 Mich App 509; 287 NW2d 282 (1979).

[20] An Article IV(e) violation was found in *People v Beamon, supra,* where defendant was returned to the general prison population at Terre Haute before a trial was concluded.

## VIII.

On appeal, defendant also raises issues involving his constitutional and statutory rights to a speedy trial. See *People v Hill,* 402 Mich 272, 282-283; 262 NW2d 641 (1978), MCL 768.1; MSA 28.1024. Our review of the records does not indicate that these claims have been resolved in the trial court. If the prosecution reinstitutes proceedings against the defendant in docket number 78-41, defendant may raise his speedy-trial claims at that time. Similarly, on remand in docket numbers 78-115 and 77-4827 defendant may raise the issue in the trial court if he is ultimately unsuccessful of his claims under the Interstate Agreement on Detainers.

## IX.

Docket number 78-41 is reversed. Docket numbers 78-115 and 77-4827 are remanded to the trial court for further proceedings as outlined in this opinion. We do not retain jurisdiction.

Reversed in part and remanded.