PEOPLE v BROWNING

Docket Nos. 77-2585, 78-3658, 78-3659. Submitted October 1, 1980, at
    Detroit.—Decided April 7, 1981. Leave to appeal applied for.

This case consists of appeals in three cases regarding the inter-
    state agreement on detainers (IAD), consolidated by order of
    the Court of Appeals. The cases appealed involve three charges
    of first-degree murder and one charge of rape against defen-
    dant, Ernest Browning. Detroit Recorder's Court, Clarice Jobes,
    J., entered an order dismissing two first-degree murder charges
    against Browning because he was returned to his original place
    of imprisonment before trial, in violation of Article IV(e) of the
    IAD. Browning, while serving a sentence for a Federal offense
    in the Federal penitentiary in Terre Haute, Indiana, was
    transferred to the Federal penitentiary in Milan, Michigan,
    pursuant to a writ of habeas corpus *ad prosequendum,* to stand
    trial on two of the first-degree murder charges in Recorder's
    Court of Detroit. A LEIN message regarding these two charges
    was sent by the police to the Terre Haute authorities. The
    prosecuting attorney appeals the dismissal of those charges in
    docket nos. 78-3658 and 78-3659.

Browning was convicted of the other first-degree murder
    charge and the rape charge, in Recorder's Court of Detroit,

---

REFERENCES FOR POINTS IN HEADNOTES

[1-13, 19] 21 Am Jur 2d, Criminal Law §§ 250.1, 250.2.
    Validity, construction, and application of Interstate Agreement on
        Detainers. 98 ALR3d 160.
[12] 31 Am Jur 2d, Extradition § 26.
[14] 46 Am Jur 2d, Judges § 252.
    Assignment of judges to other courts. 8 L Ed 2d 671.
[15] 20 Am Jur 2d, Courts §§ 20-24.
    47 Am Jur 2d, Justices of the Peace § 30.
[16] 20 Am Jur 2d, Courts §§ 20-24.
[17] 23 Am Jur 2d, Depositions and Discovery §§ 191, 192, 315.
    29 Am Jur 2d, Evidence § 602.
[18] 21 Am Jur 2d, Criminal Law § 225.
    Prosecution's suppression of evidence. 17 L Ed 2d 737.
    Withholding or suppression of evidence by prosecution in criminal
        case as vitiating conviction. 34 ALR3d 16.

Donald Hobson, J. Judge Hobson denied Browning's motion to dismiss those charges based on violation of the IAD because no detainer had been filed with the Terre Haute officials in that case. The defendant appeals those convictions in docket no. 77-2585.

The issues the Court of Appeals considered in this case were: 1) whether the defendant's presence in Michigan was properly secured under the IAD; 2) if so, whether the absence of a reference to the warrant on the documents which triggered an application of the IAD operated to deprive the defendant of the benefits of the IAD; 3) whether a stipulation signed by the defendant and his attorney purporting to waive the defendant's right to trial within 180 days under IAD Article III and 120 days under Article IV operated as a waiver of either the IAD Article IV(c) or (e) claims; 4) whether, where the IAD is applicable, Article IV(c) or (e) was violated because the defendant was not tried within 120 days of his transfer to Michigan or before his return to Terre Haute; 5) whether the transfer of the defendant back to Terre Haute before trial violated IAD Article IV(e); 6) whether the trial judge was empowered to try the defendant since he was a Common Pleas Court judge assigned to sit in Recorder's Court of Detroit by the Michigan Supreme Court; and 7) whether the prosecuting attorney's failure to produce a tape recording of an interview with a key witness and accomplice constituted a violation of a discovery order for written statements of persons with knowledge of the matters alleged in the information. *Held:*

1. The IAD was invoked by the LEIN message to the Terre Haute officials. Once a detainer is lodged against a prisoner, the act by its express terms becomes applicable and the filing state must comply with its provisions. A violation of the IAD occurred in the case in docket no. 77-2585 since the warrant for this offense arose out of a transaction separate from those enumerated in the LEIN message. However, since the defendant did not raise the issue below or on appeal, he has waived it. Thus, the defendant's motion to dismiss the charges in the case in docket no. 77-2585 was properly denied by the trial court.

2. The stipulation signed by the defendant and his attorney which purported to waive the defendant's right to trial within 180 days under IAD Article III and his right to trial within 120 days under IAD Article IV but which further stated that the defendant did not waive any jurisdictional rights already asserted in his motion to dismiss was an effective waiver of those rights.

3. The defendant's right to trial before return to his original

place of imprisonment is mandatory in the IAD, and the defendant did not waive this right. The charges upon which the detainers were lodged (docket nos. 78-3658 and 78-3659) were properly dismissed since the defendant was returned to Terre Haute before trial.

4. The prosecutor's arguments that, notwithstanding the defendant's return to Terre Haute before trial, dismissal of the charges in docket nos. 78-3658 and 78-3659 was improper because 1) the defendant was always in Federal custody as a Federal prisoner and never was housed in a state facility, so his return to Terre Haute should not be charged to the state, 2) the defendant never waived extradition as required by IAD Article III(e), 3) the IAD was never triggered because the IAD forms were never used, and 4) Federal officials transferred the defendant back to Terre Haute in furtherance of the overriding purpose of the agreement are without merit and dismissal of the charges in docket nos. 78-3658 and 78-3659 was proper.

5. The assignment of a Common Pleas Court judge to Detroit Recorder's Court was within the Supreme Court's power and that judge was empowered to try the defendant on first-degree murder and rape charges.

6. The discovery order in docket no. 77-2585 directed that the defendant's attorney be permitted discovery of all written statements made by or taken from witnesses or other persons having knowledge of the matters alleged in the information and should be construed to include a taped interview with a key prosecution witness who was an accomplice in the murder and rape with which the defendant was charged. The prosecutor is obliged to seek justice and he should have complied with the spirit of the order and given defense counsel access to the tape recording. That case should be remanded to the trial court for an evidentiary hearing at which time the witness speaking on the tape recording shall be asked to testify as to any statements he made during the tape recorded interview with the police. The policemen who conducted or witnessed the interview shall testify as to the content of the witness's statements. If the trial court determines that the tape would have affected the results of the trial, a new trial will be ordered. If the tape would not affect the trial, the defendant's conviction in docket no. 77-2585 shall be affirmed.

Dismissal of the charges in docket nos. 78-3658 and 78-3659 is affirmed. Docket no. 77-2585 is remanded for an evidentiary hearing.

CYNAR, J., concurred in part and dissented in part. He agreed

with the majority opinion in remanding the case in docket no. 77-2585 for an evidentiary hearing. However, he would hold that, under the IAD, the United States is a "state" and that the transfer of the defendant from a Federal facility in Michigan to a Federal facility in Indiana prior to trial did not violate Article IV(e). He would reverse the lower court in docket nos. 78-3658 and 78-3659.

## OPINION OF THE COURT

1. CRIMINAL LAW — DETAINERS — INTERSTATE AGREEMENT ON DE-TAINERS.

The interstate agreement on detainers is a uniform law, enacted by a majority of the states, the District of Columbia, and the Federal government, which prescribes procedures by which a prisoner may demand the prompt disposition of charges pending against him in a state other than the one in which he is imprisoned as well as procedures by which a state may obtain, for trial, a prisoner who is incarcerated in another state.

2. CRIMINAL LAW — DETAINERS — INTERSTATE AGREEMENT ON DE-TAINERS.

The purpose of the interstate agreement on detainers is to counteract the uncertainties which obstruct programs of prisoner treatment and rehabilitation where a prisoner's status is clouded by the existence of untried charges on which detainers have been lodged.

3. CRIMINAL LAW — DETAINERS — INTERSTATE AGREEMENT ON DE-TAINERS.

A detainer is a notification filed with an institution in which a prisoner is serving a sentence advising that he is wanted to face pending criminal charges in another jurisdiction.

4. HABEAS CORPUS — HABEAS CORPUS AD PROSEQUENDUM — DETAIN-ERS.

A writ of habeas corpus *ad prosequendum* is the equivalent of a detainer.

5. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS.

The interstate agreement on detainers does not apply to a prisoner unless the prisoner is serving a term of imprisonment.

6. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — FILING STATES.

The interstate agreement on detainers is applicable once a de-

tainer is lodged against a prisoner, and the filing state must comply with its provisions.

7. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — JURISDICTION.

A violation of the interstate agreement on detainers does not divest a trial court of jurisdiction over the subject matter of a case; it is a defense which must be raised before or during trial, or it is waived.

8. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — RIGHT TO TRIAL — WAIVERS.

A defendant's right to trial before return to his original place of imprisonment under the interstate agreement on detainers may be waived by the prisoner.

9. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — PRISONERS.

The rights created by the interstate agreement on detainers are for the benefit of the prisoner, exist for his protection, are personal to him and may be waived.

10. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — RIGHT TO TRIAL.

A defendant's right to trial before return to his original place of imprisonment is mandatory in the interstate agreement on detainers.

11. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — TRANSFER OF DEFENDANT.

Generally the receiving state should be charged with the responsibility for the transfer of a defendant back to the original prison under the interstate agreement on detainers where the transfer is not done at the request of the defendant or his attorney.

12. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — WAIVER OF EXTRADITION.

A prisoner who requests final disposition under the interstate agreement on detainers is presumed to have waived extradition.

13. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS.

The interstate agreement on detainers is triggered once a detainer is lodged because it is the detainer's effect on a prisoner's rehabilitation program which the act was intended to correct.

14. JUDGES — APPOINTMENT TO OTHER COURTS — STATUTES.

The Supreme Court is empowered to direct and compel a judge of any court in Michigan to serve as a judge in any court in which by law he is authorized to act as judge; both the common pleas court and recorder's court and the judges thereof are included in this power (MCL 600.225[1][c]; MSA 27A.225[1][c]).

15. COURTS — COMMON PLEAS COURT — JURISDICTION.

The Detroit Common Pleas Court has and exercises jurisdiction in all suits and proceedings, both civil and criminal, to the same extent as was had and exercised by the justices of the peace of that city immediately prior to the consolidation of the courts (MCL 728.1 et seq.; MSA 27.3651 et seq.).

16. COURTS — COMMON PLEAS COURTS — DISTRICT COURTS.

A common pleas court is now the equivalent of a district court.

17. CRIMINAL LAW — DISCOVERY — WRITTEN STATEMENTS — TAPE RECORDINGS.

An order granting discovery of written statements made by or taken from witnesses having knowledge of the matters alleged in an information should include tape recordings of a witness's statements.

18. EVIDENCE — SUPPRESSION BY PROSECUTOR.

The suppression of evidence favorable to an accused by the prosecution, where the accused has requested discovery of that evidence, violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor; the following factors are used to determine whether the rule is violated: 1) suppression by the prosecutor after a defense request; 2) the favorable character of the evidence; and 3) the materiality of the evidence.

PARTIAL CONCURRENCE AND PARTIAL DISSENT BY CYNAR, J.

19. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — TRANSFER OF FEDERAL PRISONER.

A receiving state should not be charged under the interstate agreement on detainers with the transfer by Federal authorities of a defendant from one Federal prison to another Federal facility.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Prin-

cipal Attorney, Appeals, *A. George Best, II,* Assistant Prosecuting Attorney, *Michael R. Mueller,* Assistant Prosecuting Attorney, and *Larry L. Roberts,* Assistant Prosecuting Attorney, for the people.

*Raymond A. Macdonald* and *Neal Bush,* for defendant on appeal.

Before: J. H. GILLIS, P.J., and BASHARA and CYNAR, JJ.

J. H. GILLIS, P.J. This opinion represents appeals in three cases. In docket nos. 78-3658 and 78-3659 the prosecutor appeals from the trial court's dismissal of two first-degree murder charges, MCL 750.316; MSA 28.548, which were brought under two separate warrants (nos. 74-04988 and 74-05793). In docket no. 77-2585, defendant appeals from his conviction (as charged) of first-degree murder, MCL 750.316; MSA 28.548, and rape, MCL 750.520; MSA 28.788,[1] and from the trial court's denial of his motion to dismiss those charges (lower court docket no. 74-05901). Both appeals are taken as of right, GCR 1963, 806.1, and in each we are asked to resolve a multitude of issues arising principally under the interstate agreement on detainers (IAD), MCL 780.601 *et seq.;* MSA 4.147(1) *et seq.*

The charges involved in docket nos. 78-3658 and 78-3659 were brought against defendant by warrants issued on July 2 and July 30, 1974. The charges involved in docket no. 77-2585 were brought against defendant by a warrant issued on August 3, 1974. No action occurred in any of the

---

[1] The rape charge was brought before the criminal sexual conduct statutes, 1974 PA 266; MCL 750.520a *et seq.;* MSA 28.788(1) *et seq.,* became effective on April 1, 1975.

three files until October, 1975, when the Detroit
Police Department (DPD) was advised that defen-
dant was in custody in Brownsville, Texas, pend-
ing disposition of Federal narcotics charges. At
that time, the DPD advised the Cameron County,
Texas, sheriff as follows:

"In re: Ernest Browning a/k/a Thomas Mims
        DOB 4/8/54 N/M

                  * * *

"Enclosed is a certified copy of our warrant #74-
04988 and #74-05901, both for First Degree Murder, to
be lodged against the above captioned subject who is in
your custody on narcotic charges.

"Also enclosed you will find our circular and a set of
the wanted subject's fingerprints for positive identifica-
tion.

"Please keep us informed as to the final disposition of
your case. If the subject is sentenced on your charges,
advise the institution to where he will be transferred
and the date and term of sentence."

On November 24, 1975, defendant was sentenced
to serve time in the Federal penitentiary at Terre
Haute, Indiana, after his conviction on the narcot-
ics charge. He was transferred to Terre Haute on
January 21, 1976. On January 30, 1976, a LEIN
message from the DPD to the Federal authorities
at Terre Haute was sent as follows:

"This dept holds two valid first degree murder war-
rants for Ernest Browning AKA Thomas Mims AKA
Thomas Minns N M DOB 4-8-54. Warrant 74-05793 &
Warrant 74-04988. Understand he is in your custody as
Thomas Minns ID #22831-149D. Place hold on him. We
had lodged murder warrants when in custody in
Brownsville, Texas. Were these warrants forwarded
with him to your institution. We will send letter and
warrants. Place hold for us. We will start papers Mon-

day to return him under the Agreement on Detainers. Thanks."

On February 2, 1976, the following letter was sent by the DPD to the authorities in Terre Haute:

"Enclosed herewith are certified copies of our warrants #74-04988 and 74-05793, both for First Degree Murder, and we request that these be lodged as detainers against the above prisoner.

"We will proceed to return him under the 'Agreement on Detainers.'

"Also enclosed is a copy of our circular and a set of the wanted subject's fingerprints.

"Thank you for your cooperation in this matter."

On February 5, 1976, Terre Haute acknowledged receipt of the foregoing letter. On February 6, 1976, defendant received a note from his prison counselor which advised that defendant "now has an official detainer".

On February 21, 1976, defendant was transferred from Terre Haute to the Federal prison at Milan, Michigan, pursuant to a writ of habeas corpus *ad prosequendum* which stated as its purpose: "To stand trial on warrant #74-04988 and #74-05793". These are the lower court numbers in our docket nos. 78-3658 and 78-3659. Defendant was subsequently arraigned, however, on all three warrants, on February 25, 1976. Preliminary examination was likewise held on all three warrants on April 14, 1976. During this period, defendant was housed at the Federal prison in Milan. When his presence was required in recorder's court, he was brought to the Federal building in Detroit by United States deputy marshals and there handed over to Detroit police officers, who transported him to recorder's court.

Between April 14, 1976, and June 26, 1976, various pretrial conferences were scheduled and adjourned, apparently because defense counsel had not been given certain discovery materials he had requested. On June 26, 1976, defendant was transferred from Milan back to Terre Haute, primarily because trial was not scheduled to begin until four months later.

On September 20, 1976, defendant moved to dismiss the charges on which he was ultimately convicted (docket no. 77-2585) on the basis that he was returned to his original place of imprisonment before trial, in violation of Article IV(e) of the IAD. This motion was denied by Recorder's Court Judge Hobson, on March 11, 1977, because no detainer had ever been filed in that case. A similar motion to dismiss the charges in docket nos. 78-3658 and 78-3659 was granted by Recorder's Court Judge Jobes, by order dated August 17, 1978. Although defendant raised both Article IV(e) and the speedy trial provision in Article IV(c) in the latter motion, Judge Jobes premised her decision on the Article IV(e) argument.

Subsequent to the filing of both motions, but before either was ruled upon, defendant and his attorney signed a stipulation which purported (1) to waive defendant's right to trial within 180 days under Article III(a) of the IAD, (2) to waive defendant's right to trial within 120 days under Article IV(c) of the IAD, and (3) to retain any jurisdictional rights which were asserted in defendant's motions to dismiss. This stipulation was signed on November 19, 1976, subsequent to defendant's return to Milan on or about November 7, 1976, pursuant to a second writ of habeas corpus *ad prosequendum* issued by the Michigan authorities.

On March 25, 1977, defendant was convicted as charged in docket no. 77-2585.

The several issues presented for our considera-
tion in this case are as follows:

(1) Whether the defendant's presence in Michi-
gan was secured under the IAD.

(2) If so, whether the absence of a reference to
the warrant in docket no. 77-2585 on the docu-
ments which triggered an application of the IAD
should operate to deprive defendant of the benefits
of the IAD in that case.

(3) Whether the stipulation signed by defendant
and his attorney operates as a waiver of either the
Article IV(c) or (e) claims.

(4) Whether, where the IAD is applicable, Arti-
cle IV(c) or (e) was violated because defendant was
not tried within 120 days of his transfer to Michi-
gan or before his return to Terre Haute.

(5) Whether the transfer back before trial was in
violation of Article IV(e) because

(a) defendant was always in Federal custody;

(b) defendant never waived extradition as re-
quired by Article III(e);

(c) IAD forms were never used by the state
officials; or

(d) the transfer was effected in furtherance of
the overriding purpose of the IAD: uninterrupted
rehabilitation.

(6) Whether the trial judge in docket no. 77-2585
was empowered to try defendant, given that he
was a common pleas judge assigned to sit in De-
troit Recorder's Court by the Supreme Court.

(7) Whether the prosecutor's failure to produce a
tape recording of an interview with a key witness
and accomplice constituted a violation of a discov-
ery order.

I

The IAD is a uniform law which has been en-

acted by a majority of the states, the District of Columbia, and the Federal government. It "prescribes procedures by which a prisoner may demand the prompt disposition of charges pending against him in a state other than the one in which he is imprisoned, as well as procedures by which a state may obtain for trial a prisoner who is incarcerated in another state".[2] Anno: *Validity, construction, and application of interstate agreement on detainers,* 98 ALR3d 160, 166.

The purpose of the IAD is to counteract the uncertainties which obstruct programs of prisoner treatment and rehabilitation when a prisoner's status is clouded by the existence of untried charges on which detainers have been lodged. Thus, the prisoner may demand final disposition of any untried indictments, informations or complaints. Article III. Under Article IV, the state may initiate the process whereby a prisoner is returned to the state for trial. In the language of the act, this latter process is begun by lodging a detainer against the prisoner. Article IV(a).

The act contains no definition of a detainer. It has been otherwise defined, however, as a "notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction". Senate Report 91-1356, 91st Cong, 2d Sess, 3 US Code Cong & Admin News, p 4865 (1970).

In *People v Beamon,* 83 Mich App 121; 268 NW2d 310; 98 ALR3d 149 (1978), *lv den* 403 Mich 850 (1978), another panel of this Court held that a letter from the recorder's court clerk to officials at

---

[2] Pursuant to Article II(a), a "state" includes the United States, the District of Columbia, a territory or possession of the United States, or the commonwealth of Puerto Rico.

Terre Haute, which advised of charges pending against defendant, who was incarcerated in Terre Haute, was a detainer. 83 Mich App 121, 132. Alternatively, the *Beamon* panel also found that a writ of habeas corpus *ad prosequendum* was the equivalent of a detainer. *Id.*

The latter ruling was made in the face of a split of opinion in the Federal circuit courts of appeals. Compare, *Ridgeway v United States,* 558 F2d 357 (CA 6, 1977), with *United States v Mauro,* 544 F2d 588 (CA 2, 1976), the latter holding that such a writ constitutes a detainer. In 1978, the United States Supreme Court resolved the split in *United States v Mauro,* 436 US 340; 98 S Ct 1834; 56 L Ed 2d 329 (1978), a case in which the Federal government filed three writs of habeas corpus *ad prosequendum* with state authorities. The Court held that "a writ issued by a federal court to state authorities, directing the production of a state prisoner for trial on criminal charges, is not a detainer within the meaning of the [act] and this does not trigger the application of the [act]". 436 US 340, 348. However, the "United States is bound by the [act] when it activates its provisions by filing a detainer against a state prisoner and then obtains his custody by means of a writ of habeas corpus *ad prosequendum*". *Id.*

The Supreme Court's holding was necessarily limited to the issuance of a writ by Federal authorities. The case at bar presents a similar question, however, albeit here the state is seeking the production of a Federal prisoner.

On the question whether defendant was produced in Recorder's Court pursuant to the IAD, he argues that the October, 1975, DPD letter to the Cameron County, Texas, sheriff constituted a detainer, as did the January 30, 1976, LEIN message

and the February 2, 1976, letter to the Federal authorities at Terre Haute.

Certainly, none of the written communications on which defendant relies suffers from being labeled a writ of habeas corpus *ad prosequendum.* However, the letter to the Texas sheriff cannot constitute a detainer because defendant was not then serving a sentence under a Federal conviction. Article IV of the IAD references the lodging of a detainer only to prisoners who are "serving a term of imprisonment in any party state". Further, the definition of a detainer which we quoted above states that it is a "notification filed with the institution in which a prisoner is serving a sentence". Finally, this Court previously considered a similar question, and there stated: "Consistent with its purposes, the Agreement does not apply unless the prisoner is actually serving a term of imprisonment". *People v McLemore,* 95 Mich App 536, 547; 291 NW2d 109 (1980).

The LEIN message and the letter to the Terre Haute officials do not suffer from the same infirmity; defendant was then serving a Federal prison sentence. Further, both the message and the letter advised the Terre Haute officials that defendant was wanted to face charges in Michigan. Without more, such would suffice under the above-quoted definition of a detainer. The two documents went further, however, and advised the Federal authorities that defendant would be returned under the IAD. The second letter even stated that the enclosed warrants were to be "lodged as detainers against" defendant.

The language quoted above obviously triggered an application of the IAD. The notice to defendant from his prison counselor that he now had an official detainer is reflective of the effect the mes-

sage and letter had on the Terre Haute officials. Since it is the uncertain status of prisoners with detainers lodged against them which the IAD seeks to remedy, any other conclusion would contravene the intent of that legislation.

The prosecutor argues, however, that, notwithstanding the DPD's decision to proceed under the IAD, once the writ of habeas corpus *ad prosequendum* was filed, the intent to use the act was abandoned. We cannot agree. As the United States Supreme Court stated in *Mauro, supra,* once a detainer is lodged against a prisoner, the act "by its express terms becomes applicable and the [filing state] must comply with its provisions". 436 US 340, 361-362.

## II

Having concluded that the IAD was invoked by the language of the 1976 written communications to the authorities at Terre Haute, we must now consider whether the failure to note the charges in docket no. 77-2585 in such letters operates to preclude an application of the IAD to that "case". It will be remembered, as well, that the first writ of habeas corpus *ad prosequendum* issued by the Michigan authorities likewise failed to mention the third warrant.

In considering this question, we are forced to acknowledge that, but for the fact that defendant was transferred to Milan and then to recorder's court pursuant to a detainer which did trigger an application of the IAD, the prosecutor would not have been able to try defendant then on the charges contained in the third warrant.

Article V(d) of the IAD states that "[t]he temporary custody referred to in this agreement shall be

only for the purpose of permitting prosecution *on the charge or charges* contained in one or more untried indictments, informations or complaints *which form the basis of the detainer* or detainers *or* for prosecution on *any other charge or charges arising out of the same transaction*". (Emphasis supplied.) Thus, if the third warrant involved charges arising out of the same transaction as one or both of the noted warrants, defendant could have been tried thereunder pursuant to the IAD.

Our review of the lower court files reveals that the three warrants arose out of three different criminal transactions occurring on January 19, 1974 (number 74-05793), April 11, 1974 (number 74-04988), and May 21, 1974 (number 74-05901). Consequently, we must determine if a violation of Article V(d) occurred and was preserved by defendant.

Under the clear terms of Article V(d), a violation occurred in this case. However, we are not convinced that defendant preserved that violation. A violation of the agreement does not divest the trial court of jurisdiction over the subject matter of the case. *State v Casuso,* 253 NW2d 919, 921 (Iowa, 1977). It is a defense which must be raised before or during trial or it is waived. *Christian v United States,* 394 A2d 1 (DC App, 1978), *cert den sub nom Clark v United States,* 442 US 944; 99 S Ct 2889; 61 L Ed 2d 315 (1979). Because defendant did not raise this violation below, or even on appeal, he has waived it.

The practical consequence of the waiver must now be determined. The IAD, Article V(d), states that the temporary custody provided in the IAD is only for purposes of prosecution of charges on which a detainer has been lodged. Of necessity, the protections offered by the IAD are also only appli-

cable where the defendant is prosecuted on charges on which a detainer has been lodged. Thus, when defendant was arraigned, etc., on the third warrant, *without an objection based on Article V(d),* that case may be said to have been prosecuted outside of the IAD. We express no opinion on the question whether a defendant who does object on such grounds is still entitled to the protections of the IAD. We only say that, if such protections were not applicable in such cases, the way would be open for prosecutors to file detainers on the least serious charge pending against a prisoner and then proceed on numerous other more serious warrants after the defendant is within the jurisdiction, without concern for the protections offered by the IAD.

Our conclusion that in this case defendant waived any right to the protection of the IAD does no violence to the purposes of the IAD; nor does it divest defendant of all protection. However, in this case, the above conclusion does result in the finding that defendant's motion to dismiss the charges in docket no. 77-2585 was properly denied by the trial court.

## III

Having decided that defendant was entitled to the protection offered by the IAD in docket nos. 78-3658 and 78-3659, but not in docket no. 77-2585, the next issue for our consideration is the effect of a stipulation signed by defendant and his attorney which purported to waive defendant's right to trial within 180 days under Article III, and his right to trial within 120 days under Article IV, but which further stated that defendant did not waive any jurisdictional rights already asserted in his motion to dismiss.

The stipulation was clearly signed before the motion to dismiss was ruled upon. In his argument on appeal, defendant does not address the effect of the stipulation on his IAD rights. Nonetheless, the issue is crucial to a proper resolution of this case. Indeed, the prosecutor argues on appeal that, notwithstanding the application of the IAD to docket nos. 78-3658 and 78-3659, defendant's waiver operates to bar his asserted right to a speedy trial under either Article III or IV of the IAD.

While the effect of a waiver on Article III or IV rights does not appear to have been considered by Michigan courts, there are several Federal cases which are informative. In *Gray v Benson,* 443 F Supp 1284, *supp'd* 458 F Supp 1209 (D Kan, 1978) *aff'd* 608 F2d 825 (CA 10, 1979), the court considered whether a defendant's right to trial before return to the original place of imprisonment was waived by his subsequent guilty plea. After finding that the IAD had been violated by such a transfer, 443 F Supp 1284, 1293, the district court requested additional briefs on the waiver issue. 443 F Supp 1284, 1294. Subsequently, in the supplemental opinion, the conclusion was reached that the right to trial before return is waivable by the prisoner. The most cogent reasons for that ruling were: (1) that otherwise a prisoner could not request pretrial return for any legitimate purpose "since it would result in automatic dismisal of the indictment", 458 F Supp 1209, 1212; and (2) that, if such "fundamental, constitutional rights as the right to counsel or trial by jury" could be waived, it would be anomalous not to recognize waivers of IAD rights. 458 F Supp 1209, 1213.

The *Gray* court also addressed the manner in which a waiver could be effected. In this regard, it noted that "Article IV(e) of the IAD amounts to

nothing more than a procedural rule and the right it protects in no way affects the fairness and accuracy of the factfinding procedure. Nor does it preserve or affect other due process or trial rights. Rather, it involves an unrelated right to rehabilitation without interruption in connection with incarceration on a prior sentence. Thus, a claim under IV(e) can hardly be construed as jurisdictional". 458 F Supp 1209, 1213.

In *United States v Eaddy,* 595 F2d 341 (CA 6, 1979), the issue of waiver was analyzed as follows:

"Despite the mandatory language of Article IV, the rights created by the Agreement are for the benefit of the prisoner. They exist for his protection and are personal to him. (Citations omitted.) We conclude, therefore, that the rights of a prisoner under the Agreement may be waived.

"* * * We also hold the substantive rights accorded to a prisoner under Article IV may be waived, even though the prisoner is not aware of those rights, where there is an affirmative request to be treated in a manner contrary to the procedures prescribed by Article IV(c) or (e)." (Citations omitted.) 595 F2d 341, 344.

Both in *Gray* and in *Eaddy,* the courts focused on the purpose of the IAD in determining whether a waiver of rights could be effected. Such analysis began with the proposition that the IAD is designed to protect a prisoner's "right" to uninterrupted rehabilitation, and "right" to have charges outstanding in other jurisdictions (on which detainers were filed) finally disposed of so that the prisoner could return to the original place of imprisonment with certain knowledge of the outcome of such charges. As such, it is not difficult to accept that the right to trial before return might be waived by a prisoner whose priorities require a return before trial. Similarly, the right to trial

within a certain number of days may likewise be waived, for reasons which are similarly high on the prisoner's priorities. Certainly, our own 180-day rule, MCL 780.131; MSA 28.969(1), may be impliedly waived by the defendant if the case stands ready for trial within that time, but the "defendant's delaying motions" cause a sufficient delay to preclude trial from commencing before the end of that period. *People v Hendershot,* 357 Mich 300, 304; 98 NW2d 568 (1959). Thus, we conclude that defendant waived his rights under both Articles III and IV(c).

## IV

The stipulation which was signed by defendant and his attorney in all three lower court cases stated that defendant waived his right to trial within 180 days under Article III as well as his right to trial within 120 days under Article IV(c). Clearly, then, defendant waived whatever claim he had regarding trial within 120 or 180 days under the IAD.

Noticeably absent from the stipulation was any waiver of defendant's right to trial before return to his original place of imprisonment. And yet, he was returned to Terre Haute before trial, and he raised this fact as a basis for dismissal in his motions.

The right to trial before return is mandatory in the IAD. *People v Beamon, supra,* 134. Consequently, we conclude that the charges upon which detainers were lodged were properly dismissed by the lower court.

## V

The prosecution argues that, notwithstanding

defendant's return to Terre Haute before trial, dismissal was improper because: (1) defendant was always in Federal custody, as a Federal marshal prisoner, and never was housed in a state facility, so his return to Terre Haute should not be charged to the state; (2) defendant never waived extradition as required by Article III(e); (3) the IAD was never triggered because the IAD forms were never used; and (4) Federal officials transferred defendant back to Terre Haute in furtherance of the overriding purpose of the agreement: uninterrupted rehabilitation.

Defendant was transferred back to Terre Haute at a time when trial was not scheduled to begin for another four months. Testimony at a Federal court hearing in a simultaneously ongoing case involving this issue indicated that defendant's transfer was initiated by a United States deputy marshal who thought that he had received authorization for such a move from an assistant prosecuting attorney. Because the state attorney was, without question, in Europe when the transfer was initiated, we are left only with the knowledge that the move was partly at the behest of Federal officials.

Where the transfer back is not done at the request of defendant or his attorney, we believe that the state should be charged with the responsibility therefor. In no other way can the defendant's right to final disposition before return be adequately safeguarded. This is not to say that, if absolute proof were given that the state authorities had nothing to do with the transfer and in fact attempted to stop it, another result might be reached. However, in this case, the Federal marshal apparently received permission to transfer defendant from Milan to Terre Haute from some-

one in the prosecutor's office. Thus, because defendant did not request or clearly acquiesce in the transfer and because the state has not established that the transfer was effected against its wishes, the failure to try defendant before returning him to Terre Haute constitutes a violation of Article IV(e) of the IAD. See, *e.g.*, *United States v Sorrell,* 413 F Supp 138, 141 (ED PA, 1976), *aff'd* 562 F2d 227 (CA 3, 1977), *cert den* 436 US 949; 98 S Ct 2858; 56 L Ed 2d 793 (1978), where the district court ruled that "[i]t matters not, as we see it, what the purpose of the transfer was". See, also, *People v Lincoln,* 42 Colo App 512; 601 P2d 641 (1979), where the court stated that the receiving state bears the burden of proving the sending state's compliance with the IAD in an analogous situation.[3]

We also reject the prosecutor's assertion that, because defendant was always in Federal custody, in Terre Haute and in Michigan, the return to Terre Haute cannot be charged to the state. As was said in *People v McLemore, supra,* 546-547:

"The argument that the agreement does not apply because no change of custody actually took place is without merit. * * * [P]hysical custody does not have to change hands when a Federal prisoner is involved. Article V(a) specifically provides that a Federal prisoner may be brought to the place of trial while remaining in Federal custody."

---

[3] In *Lincoln [People v Lincoln,* 42 Colo App 512; 601 P2d 641, 643-644 (1979)], defendant sought a dismissal of certain charges on which a detainer had been filed because the prison officials had never advised him of the detainer or of his right to request final disposition of the charges. 601 P2d 641, 642. The Colorado Court of Appeals ruled that, between the prisoner and the state, "[t]he purpose of the Agreement requires that the adverse consequences of official oversights be visited upon the prosecution, not upon the prisoner. Only in this way can the goals of the Agreement be achieved by requiring the officials concerned to learn of their duties under the Agreement, and to perform them conscientiously". 601 P2d 641, 644.

The prosecutor's second and third assertions with regard to the transfer back before trial is that the IAD is inapplicable because defendant never waived extradition under Article III(e) and because the IAD forms were never used. The extradition argument is without merit. Article III(e) states that, if a prisoner requests final disposition of charges on which a detainer has been lodged [such request being made under Article III(a)], the request shall be deemed a waiver of extradition. This language does not *require* a defendant to waive extradition. Neither does *Edmond v Dep't of Corrections,* 78 Mich App 196; 259 NW2d 423 (1977).

In *Edmond,* a Florida detainer was lodged against plaintiff, a Michigan prisoner, but no further action was ever taken. When plaintiff sued for a writ of mandamus directing the Michigan Department of Corrections to strike the detainer from his records, this Court ruled that such writ could not be issued because plaintiff never invoked his right to final disposition under Article III. 78 Mich App 196, 203-204.

There was no question in *Edmond* whether the IAD was violated by a pretrial return of a prisoner to his original place of imprisonment. There, plaintiff was seeking to enforce rights arising under Article III rather than Article IV. These two articles are directed at opposite sides of the same coin. Article III provides a means by which the prisoner can expedite a final disposition and sets forth remedies for those cases in which the prosecutor does not proceed upon the detainer. Article IV provides the means by which the prosecutor may secure defendant's presence at trial and likewise sets remedies if the prosecutor does not follow up on his initial efforts. Thus, under Article III(e), the

prisoner who requests final disposition is presumed to have waived extradition. Under Article IV, when the prosecutor lodges a detainer and then requests temporary custody, waiver of extradition is not required. Rather, once a request for temporary custody is made, Article IV(a) provides a 30-day period in which the governor of the sending state may disapprove the request on his own motion or upon motion of the prisoner. In this way, a prisoner contests transfer; if no motion is made within 30 days, it is apparently assumed that the prisoner has no objection to the move.

We likewise reject the prosecutor's suggestion that, because the state did not use "IAD forms" to process defendant's return to Michigan, defendant should not be benefitted by an application of the IAD's prohibition on return before trial. This argument, if accepted, would emasculate the entire agreement. Once a detainer is lodged, the IAD is triggered. This is because it is the detainer's effect on a prisoner's rehabilitation program which the IAD was intended to correct. Were we to hold that the prosecutor's failure or refusal to use "IAD forms" operates to deprive defendant of the benefits of the agreement, we would be placing defendant at the mercy of the prosecutor.

The final basis on which the prosecutor asserts that the IAD is inapplicable is that the transfer back was made in furtherance of the IAD's purpose: uninterrupted rehabilitation. As we concluded above, however, the purpose of the transfer does not matter. Defendant's rehabilitation had already been interrupted by his transfer to Milan from Terre Haute. At that point, the purpose of the IAD is to secure trial on pending charges on which a detainer has been lodged in order that the prisoner may be returned to his original place of imprisonment as soon as possible. However, when

defendant was returned to Terre Haute before trial, the detainer was still lodged against him, and any attempts to continue rehabilitation would be restricted by that fact and the fact that defendant was surely going to be returned to Michigan within four months. If defendant had acquiesced in this situation, the result might be different. Because he did not, we conclude that Article IV(e) of the IAD was violated and the charges in docket nos. 78-3658 and 78-3659 were properly dismissed.

## VI

Our docket no. 77-2585 was assigned to be heard by Judge Donald L. Hobson, a common pleas judge sitting in recorder's court pursuant to a Supreme Court assignment. On March 15, 1977, defendant moved to disqualify Judge Hobson on the basis that he was not properly elected to recorder's court. Defendant now claims error in the denial of that motion.

MCL 600.225(1)(c); MSA 27A.225(1)(c) empowers the Supreme Court to "direct and compel a judge of any court * * * to serve as a judge in any court in which by law he is authorized to act as judge". Both the common pleas court and recorder's court, and the judges thereof, are included in this power. Under subsection 2 of that statute:

"The supreme court shall have the power to direct and compel the judge of any municipal court who is an active member of the state bar of Michigan or any district court judge to serve as a judge of the recorder's court of the city of Detroit. Each judge so designated shall hold court and perform the duties of the office just as he would had he been elected to such recorder's court for the time he is designated to serve. A municipal court judge shall be limited to trial and other

proceedings wherein elected recorder's court judges act in a magisterial capacity exercising jurisdiction comparable to that formerly cognizable by a justice of the peace. A district court judge so designated shall exercise the same jurisdiction as exercisable by a judge of the recorder's court of Detroit."

Thus, the question is whether a common pleas judge is the equivalent of a municipal court judge or a district court judge. If the former, the common pleas judge may only exercise jurisdiction comparable to that formerly cognizable by a justice of the peace. If the latter, the common pleas judge's jurisdiction is the same as that exercised by any recorder's court judge.

Pursuant to 1929 PA 260; MCL 728.1 *et seq.;* MSA 27.3651 *et seq.,* the courts of justices of the peace in any city having more than 250,000 inhabitants were consolidated into one court entitled the common pleas court. MCL 728.1; MSA 27.3651. Such common pleas courts "shall have and exercise jurisdiction in all suits and proceedings, both civil and criminal, to the same extent as was had and exercised by the justices of the peace of such city immediately prior to the consolidation of the courts". Thus, the common pleas court *was* comparable to a justice court. Because justices of the peace were abolished when MCL 600.9921; MSA 27A.9921 was enacted, and replaced by district courts, MCL 600.9922; MSA 27A.9922, however, it seems reasonable to conclude that the common pleas court is *now* the equivalent of a district court.[4] This conclusion is consistent with MCL

[4] MCL 600.9921; MSA 27A.9921 also abolished municipal courts, *except as provided in* MCL 600.9928; MSA 27A.9928 and MCL 600.9930(8); MSA 27A.9930(8). This further strengthens our opinion that the common pleas court is comparable to the district court, since the common pleas court was retained despite abolition of most municipal courts.

600.8105; MSA 27A.8105, which states that no district court judges shall be elected in any district in which there is a common pleas court. As such, we find that the assignment of a common pleas judge to recorder's court was within the Supreme Court's power under MCL 600.225(2); MSA 27A.225(2), and that such judge was empowered to try defendant on first-degree murder and rape charges.

## VII

On April 23, 1976, Recorder's Court Judge Borman entered a discovery order which directed that defendant's attorney "be permitted, forthwith, to inspect and make copies of those items set forth in [defendant's discovery] motion, at defendant's expense". As regards this issue, the motion requested discovery of "all written statements made by or taken from witnesses or other persons having knowledge of the matters alleged in the information". Defendant now asserts a violation of this order because the prosecution never turned over to defendant a taped interview with Michael Champion, a key prosecution witness who was an accomplice in the murder and rape with which defendant was charged. The prosecutor counters defendant's assertion by stating that, because defense counsel never requested "aural" or "video" recordings of any witness and the order did not include such material, no error occurred.[5]

---

[5] The prosecutor also notes that defendant made two motions before this Court on the issue of Champion's statements, both of which were denied. In the first, defendant moved for remand for an evidentiary hearing under GCR 1963, 817.6. By order dated May 14, 1979, the motion was denied for lack of merit in the grounds presented. This order does not affect our review. The second motion denied on June 19, 1979, requested an additional transcript of testimony regarding Champion's statements and the loss of the tape. This order does not affect our review of the issue.

In considering this question, we first note that the prosecutor knew of the order when it was issued, as evidenced by his signature thereon. Thus, there is no reason for the prosecutor to premise his noncompliance therewith on the fact that the order was not "served" on him until mid-trial.

Secondly, we note that the motion requested and the order granted discovery of "written statements made by or taken from witnesses having knowledge of the matters alleged in the information". The Champion tape was not a written statement. Nevertheless, we think that the intent of the request should supersede, in a sense, the qualification "written". See, *e.g., People v Florinchi,* 84 Mich App 128, 134-135; 269 NW2d 500 (1978), *lv den* 405 Mich 828 (1979), where this Court liberally construed the term "police reports" to include tip sheets (sheets "on which the police recorded information received from informants which was in some way connected to the investigation of the case"). *Id.,* 132-133. The prosecutor is obliged to seek justice, *People v Farrar,* 36 Mich App 294, 299; 193 NW2d 363 (1971); he should thus have complied with the spirit of the order and given defense counsel access to the tape recording(s).

In *Brady v Maryland,* 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), the United States Supreme Court held:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

The following factors are used to determine whether the *Brady* rule was violated: (1) suppres-

sion by the prosecutor after a defense request; (2) the favorable character of the evidence; and (3) the materiality of the evidence. *Moore v Illinois,* 408 US 786, 794-795; 92 S Ct 2562; 33 L Ed 2d 706, *reh den* 409 US 897; 93 S Ct 87; 34 L Ed 2d 155 (1972).

In the instant case, defendant's discovery motion constitutes a request for the tape. As the recording "could have been admitted to assist defense counsel in attacking the key witness's credibility", it would have been material to defendant's guilt. See, *People v Torrez,* 90 Mich App 120, 125; 282 NW2d 252 (1979), *lv den* 407 Mich 936 (1979). Whether the statement would have been favorable to (or affected the outcome of) defendant's case is unclear.

In *People v Drake,* 64 Mich App 671, 682-683; 236 NW2d 537 (1975), *lv den* 402 Mich 846 (1977), the Court remanded for an evidentiary hearing to determine whether the evidence would have been favorable. In the event such a determination could not be made, however, a new trial was ordered "because, in such a case, we could not find the error to have been harmless beyond a reasonable doubt". *Id.* As in *Drake,* we have concluded that this case (docket no. 77-2585) should be remanded to the trial court for an evidentiary hearing at which Michael Champion shall be asked to testify as to any statements he made during the tape recorded interview with the police. Additionally, the policemen who conducted or witnessed the interview shall testify at such hearing as to the content of Champion's statements. If the trial court determines that the tape recording would have affected the results of the trial, a new trial shall be ordered, at which Champion may testify. The transcript of the evidentiary hearing may be used to cross-examine or impeach his testimony. If

the trial court determines that the tape recording would not likely have affected the outcome of the trial, defendant's convictions in docket no. 77-2585 shall be affirmed.

## VIII

The lower court's dismissal of the charges in docket nos. 78-3658 and 78-3659 is affirmed on the basis that Article IV(e) of the IAD required dismissal when defendant was returned to Terre Haute before trial. The matter in docket no. 77-2585 is remanded for an evidentiary hearing in keeping with section VII, *supra.*

Affirmed in part and remanded in part for proceedings consistent with this opinion. We retain no further jurisdiction.

BASHARA, J., concurred.

CYNAR, J. *(concurring in part and dissenting in part).* While I concur in the decision to remand the matter in docket no. 77-2585 for an evidentiary hearing for the reasons stated in the opinion of my brother GILLIS, I must strongly dissent from the affirmance of the lower court's dismissal of the charges in docket nos. 78-3658 and 78-3659 on the basis that Article IV(e) of the Interstate Agreement on Detainers (IAD) required dismissal when defendant was returned to Terre Haute before trial.

Articles I and II of the IAD[1] provide as follows:

"ARTICLE I

"The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in

[1] MCL 780.601 *et seq.;* MSA 4.147(1) *et seq.,* 18 USC Appendix § 2.

securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints. The party states also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of co-operative procedures. It is the further purpose of this agreement to provide such co-operative procedures.

"ARTICLE II

"As used in this agreement:

"(a) 'State' shall mean a state of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico.

"(b) 'Sending state' shall mean a state in which a prisoner is incarcerated at the time that he initiates a request for final disposition pursuant to Article III hereof or at the time that a request for custody or availability is initiated pursuant to Article IV hereof.

"(c) 'Receiving state' shall mean the state in which trial is to be had on an indictment, information or complaint pursuant to Article III or Article IV hereof."

The majority reasons that defendant was transferred from Milan to Terre Haute at a time when trial was not scheduled to begin for another four months. Testimony in a Federal court hearing involving the same issue indicated that defendant's transfer was initiated by a United States deputy marshal who believed he received authorization for such a move from an assistant prosecuting attorney, who undisputedly was in Europe at the time of the alleged authorization. An assumption should not be made that some unknown person in the prosecutor's office gave permission to

transfer defendant from Milan to Terre Haute. The State of Michigan, the receiving state, should not be charged, under the facts in this case, with the transfer of the defendant from Milan, a Federal facility, to Terre Haute, another Federal facility.

Assuming for purposes of argument that the defendant was transferred from Milan to Terre Haute on the basis of authorization granted to the Federal marshal by an unknown assistant prosecuting attorney, the return to Terre Haute from Milan did not constitute a violation of IAD. Under the definitions found in Article II of the IAD, the United States is a "state" for purposes of the IAD. In this case the transfer was from Milan, a part of the sending state, to Terre Haute, another part of the sending state. The defendant, while at Milan or at Terre Haute, never left the custody of the United States, which was the sending state herein under the IAD. To determine in this case that a transfer occurred in violation of IAD would require a determination that the transfer was from the receiving state to the sending state. This we cannot do on the facts before us.

I would reverse the lower court's dismissal of the charges in docket nos. 78-3658 and 78-3659 and would remand the matter in docket no. 77-2585, as decided by the majority.