Raymond J. HANLON, Plaintiff,
Appellant,

v.

PROVIDENCE COLLEGE, Defendant,
Appellee.

No. 79-1137.

United States Court of Appeals,
First Circuit.

Submitted Sept. 14, 1979.

Decided Jan. 21, 1980.

Raymond J. Hanlon on brief pro se.

William F. McMahon, Providence, R. I., on brief for defendant, appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

In 1961, Raymond J. Hanlon left his employment in upstate New York as a secondary school teacher and as a cross-country and track coach at LeMoyne College, and went to Rhode Island to teach in the Education Department and coach cross-country and track at Providence College. Dr. Hanlon was given tenure in 1968. In 1969, however, he was relieved of his coaching duties as a result of a dispute between him and some track team members. In 1975, Dr. Hanlon sued Providence College for breach of contract, alleging that the College had unlawfully terminated his coaching duties, reduced his salary accordingly, and deprived him of other benefits. Federal jurisdiction was founded upon diversity of citizenship.[1] 28 U.S.C. § 1332. The case started as a jury trial, but during the trial the parties waived their right to a jury and the remainder of the case was heard by the district judge. After receiving post-trial briefs, the district judge issued a lengthy opinion in which he concluded there had been no breach of contract. Judgment was entered for the College, and Dr. Hanlon appealed.

Although represented by counsel in the district court, Dr. Hanlon is proceeding *pro se* on appeal. In a well-written brief, he urges reversal of the district court judgment on several grounds: (1) that the district court erroneously excluded parol evidence concerning his original agreement with the College, (2) that the trial court's attitude, coupled with its refusal to allow the introduction of parol evidence, induced him to waive his right to a jury trial, and (3) that the district court's finding that the grant of tenure extended only to his teaching post and not to his coaching position

---

1. The district court found, with ample evidentiary support, that Dr. Hanlon's domicile was New York, notwithstanding his residence much of the year in Rhode Island. The College has not challenged this finding.

was clearly erroneous. Dr. Hanlon also argues in passing that the district court improperly concluded that the College's failure to notify him of his opportunity for promotion was only a technical breach of contract. We address these issues seriatim.[2]

### 1. *The Exclusion of Parol Evidence at Trial*

█ During the trial, the district court excluded oral testimony concerning Dr. Hanlon's original agreement with the College. The district judge was then of the opinion that such parol evidence was inadmissible. Consequently, he accepted the evidence only in the form of an offer of proof.

After post-trial briefing, however, the district court reversed itself and ruled the evidence admissible under Rhode Island law, particularly *Drans v. Providence College*, 383 A.2d 1033 (R.I.1978), and *Golden Gate Corp. v. Barrington College*, 98 R.I. 35, 199 A.2d 586 (1964). In rendering its decision, the district court gave full consideration to the parol evidence of Dr. Hanlon presented by offers of proof. Thus, Dr. Hanlon is not in a position to complain on appeal that the evidence was ultimately disregarded by the district court.[3] His real complaint is that the court's erroneous refusal to allow the jury to hear the parol evidence led him to waive his right to a jury trial.

### 2. *The Jury Trial Waiver*

█ Dr. Hanlon's waiver of his right to a jury trial came about in the following fashion. After the district court ruled, in the absence of the jury, that parol evidence would not be admitted, the jury was removed from the courtroom four more times

on the first day of trial so that Dr. Hanlon could make offers of proof. At several points, the court expressed impatience at counsel's persistence in arguing the admissibility of the evidence. The court also observed that, although Dr. Hanlon had a "perfect right" to a jury trial, proceeding with a jury made matters difficult because the court had to be "restrictive" so as to prevent the jury from hearing inadmissible evidence. If Dr. Hanlon waived a jury, the court said, all of the evidence could be received, its admissibility could be argued in post-trial briefs, and a full record could be made for appeal. Nevertheless, while Dr. Hanlon was proceeding in front of the jury, the court did not limit his offers of proof and even assisted him in making them. On the morning of the second day of trial, the district judge announced that Dr. Hanlon's counsel had informed him that he was having difficulty formulating an offer of proof and that his client would waive a jury if the court would hear his parol evidence *de bene*. Both the court and the College's lawyer agreed to this procedure. Before trial proceedings resumed, the court asked "[I]t's understood now, the jury is waived in this case?" Dr. Hanlon's counsel responded, "Yes, Your Honor, we are waiving the jury," and the College's attorney remarked, "That's correct, Your Honor."

Reviewing this chain of events, we must conclude that the trial judge encouraged Dr. Hanlon to waive a jury, and that Dr. Hanlon's decision to do so resulted from the court's exclusion of parol evidence. This conclusion is supported by the fact that Dr. Hanlon (unsuccessfully) moved for a new trial on the ground that he would not have

---

**2.** On appeal, Dr. Hanlon makes no legal argument concerning his claims below that the College improperly modified its faculty children scholarship policy, restricted his opportunity to teach in the extension school, terminated his graduate school teaching duties, and denied him certain travelling expenses. Therefore, the district court's findings on these issues need not be considered here.

Dr. Hanlon has also abandoned his argument that, even if the College did not breach its agreement with him by terminating his coaching duties, the College had a duty to make

reasonable transitional provisions because of the resulting drop in his income. Concerning this issue, the district court found that Dr. Hanlon failed to adduce any evidence that it would be common practice in the academic community to make transitional provisions in such circumstances. *See Drans v. Providence College*, 383 A.2d 1033, 1042 (R.I.1978).

**3.** For the same reason, we need not consider the College's argument that the parol evidence was properly excluded as immaterial.

waived a jury but for the court's exclusion of parol evidence and the resulting fragmentation of the trial by the need for offers of proof outside the jury's presence. Nevertheless, Dr. Hanlon has not convinced us that, because the district court reversed itself in its post-trial ruling admitting the parol evidence, he was entitled to revoke his jury trial waiver.[4]

In the first place, the waiver appears to have been perfectly valid. It was made in accordance with Rule 39(a)(1), Fed.R.Civ.P., which permits withdrawal of a jury trial demand if "the parties or their attorneys of record, . . . by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury[.]" *See also* Rule 38(d), Fed. R.Civ.P. (withdrawal of a jury trial demand must be by consent of the parties). There is no suggestion that counsel was acting against Dr. Hanlon's wishes. *Compare Schepp v. Langmade*, 416 F.2d 276, 278 (9th Cir. 1969).

Nevertheless, Dr. Hanlon argues that, by reason of the court's attitude and its erroneous ruling, his waiver of a jury trial was involuntary. In his words, he had no choice: "Either proceed hamstrung before a jury already prejudiced by the court's rulings, incur judicial wrath as a result of the court's wrongful application of the parol evidence rule or accede to the court's ultimatum and waive the jury trial." We

think this overstates the situation. Although the district judge made it plain that he preferred to hear the case jury-waived, he explicitly recognized Dr. Hanlon's right to continue with a jury and allowed him to make full offers of proof. Furthermore, although such offers of proof occasioned the periodic removal of the jury from the courtroom, the record does not support Dr. Hanlon's assertion that, as a consequence, the jury became hopelessly confused.[5] As we read the record, Dr. Hanlon had a choice to continue with the jury, hoping to convince the district judge ultimately that his exclusion of parol evidence was error, or to prevail on this point on appeal, if an appeal proved necessary. Instead, Dr. Hanlon decided, while the court was in overnight recess and with ample opportunity to consult with his experienced counsel, to waive jury and continue the case as a bench trial. We cannot say this decision was made under such coercion that it should be voidable. The fragmentation of the trial was due to the district court's patience in not only allowing plaintiff's offers of proof to be spread fully on the record, but in listening to argument on their admissibility.[6] The court cannot be faulted for keeping from the jury what, at the time, it deemed to be inadmissible and prejudicial evidence.

■ Ordinarily, once a party withdraws his demand for a jury trial, with the requisite consent of the other parties, he may not

---

**4.** This makes it unnecessary for us to consider the College's argument that the jury waiver was of no consequence because the evidence did not present a jury question and the court would have been obliged to direct a verdict for the College.

**5.** Dr. Hanlon relies on the following interchange between the court and the jury foreman:

> JURY FOREMAN: I have a question.
> THE COURT: Yes.
> JURY FOREMAN: If something is going on that we really didn't hear the question or understand the question, as far as the jury is concerned should we stop and ask, or how do we handle it?
> THE COURT: If you don't hear you certainly just raise your hand and tell me you can't hear and I will have it repeated. If it is something you don't understand, by that you

mean you don't understand what the witness said or what the question means, is that what you have in mind?

> JURY FOREMAN: Probably what the witness said or probably even what was, what the question means, or, it's just me, Your Honor, as, for instance, I was a little lost at one point in time, okay, as far as a few of those documents [notices of contract] there, you know, whether they were on a yearly basis or what . . .

Although this discussion occurred upon the jury's return to the courtroom after a conference in their absence, it does not indicate to us that the jury was confused because of fragmentation of the trial.

**6.** We add that Dr. Hanlon's counsel could have reduced the number of interruptions in the trial by formulating a comprehensive offer of proof, as he was invited to do by the court.

change his mind. *See West v. Devitt*, 311 F.2d 787, 788 (8th Cir. 1963); 5 Moore's Federal Practice ¶ 38.45, at 344.2–.3 (2d ed. 1979). *See generally Country (Social) Club of Savannah, Inc. v. Sutherland*, 411 F.2d 599, 600 (5th Cir. 1969) (the parties' waiver of a jury trial was "effective and binding"). We think this should especially be the rule when a trial has been completed jury-waived. Otherwise, a party who came to regret his decision to stipulate to a bench trial could saddle an adversary who joined his stipulation with the unfair burden of a second trial.

The one case Dr. Hanlon cites for the proposition that he should be released from his jury waiver is distinguishable. In *Franks v. United States Lines Co.*, 324 F.2d 126 (2d Cir. 1963), the district court had allowed a seaman a jury trial on his negligence and unseaworthiness claims, but had reserved decision on his maintenance and cure claim to itself, relying on a case that was subsequently overturned by the Supreme Court in *Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963). Reversing for a new trial, the second circuit rejected the argument that the seaman waived his right to a jury trial on the maintenance and cure issue. The court said "We think it would be manifestly unfair to hold the plaintiff to a waiver because of failure to protest more vigorously the court's quite precise ruling [reserving the maintenance and cure issue to itself]." 324 F.2d at 127 n.1, *Franks*, therefore, was a case in which the district court erroneously ruled that there was no right to a jury trial and in which no clear waiver of that right was made. Here the district court did not erroneously deny a jury trial, but only reversed itself on an evidentiary point, and a clear waiver of jury trial was made.

In short, Dr. Hanlon made a considered decision to forego a jury trial and unequivocally withdrew his jury demand pursuant to Rule 39(a)(1), Fed.R.Civ.P. In these circumstances, we see no error in the denial of his motion for a new trial by jury.[7]

3. *The Trial Judge's Findings About Dr. Hanlon's Coaching Position*

■ The district court found that the 1961 agreement between Dr. Hanlon and the College did not grant Dr. Hanlon a permanent right to coach or involve a promise to provide tenured status or eligibility for it in his coaching position, and that the 1968 grant of tenure to Dr. Hanlon applied only to his teaching position in the Education Department. Although Dr. Hanlon attacks these findings as clearly erroneous, we find them amply supported by the evidence.

Concerning his original agreement with the College, Dr. Hanlon testified that College officials had orally offered him a "package arrangement" that included the opportunity to teach and coach, to have retirement contributions made on both his teaching and coaching salaries, to schedule his classes in the morning, and to spend the money allocated for track and cross-country and to decide what meets would be entered as he saw fit. Among the trial exhibits was a letter from Acting President Father Dore welcoming Dr. Hanlon to the Providence College faculty and expressing confidence that he would "make a marked contribution to [the] Education Department and as Coach of Track." There was evidence that Father Dore's letter was accompanied by separate "Notice[s] of Contract," announcing his salaries for his teaching and coaching services in 1961–62. On the basis of this evidence, the district court could find that Dr. Hanlon was initially employed as

7. We do not go so far as to say that post-judgment relief from a valid withdrawal of a jury trial demand can never be afforded. Professor Moore has suggested, for example, that when a new trial has been ordered for some independent reason, the district court should have discretion to relieve a party of his stipulation to a jury-waived trial and to allow retrial before a jury. 5 Moore's Federal Practice ¶ 38.44, at 343–44 n.27. *See also Chanofsky v. Chase Manhattan Corp.*, 530 F.2d 470 (2d Cir. 1976) (motion to vacate judgment should have been allowed due to the plaintiff's unawareness that a motion hearing had been converted to a trial on the merits; plaintiff should be allowed to withdraw his jury waiver because the court has indicated its views on the factual issues in the case).

both a teacher and a coach, but was not promised indefinite employment as a coach.

■ Concerning the 1968 grant of tenure, Dr. Hanlon testified that he was awarded tenure on November 5, 1968, retroactive to July 1 of that year. This is confirmed by one of the exhibits, a letter from College President William Haas to Dr. Hanlon. The issue was whether the tenure applied to his coaching position. Dr. Paul V. K. Thomson, Academic Vice-President of the College (and, as such, the nonvoting Chairman of the Committee on Academic Rank and Tenure), testified that College personnel can serve in more than one capacity, but that only ordinary faculty members can be given tenure,[8] that tenure is only granted in a specific academic capacity, and that a faculty member could not achieve tenure in connection with his administration or Athletic Department duties. For example, Dr. Thomson explained that he was tenured as Professor of Education, but not as Academic Vice-President. Reverend Francis Charles Duffy, who as Vice-President for Student Relations oversees the Athletic Department, testified that none of the people in that department have tenure except certain part-time coaches who are tenured as teachers in some other department. He further testified that the situation was the same at other private colleges in Providence College's class, at which athletic coaches are not tenured in that position, but may be tenured in another capacity.[9] From this evidence the district judge could find that Providence College grants tenure only in academic positions and that the tenure

granted Dr. Hanlon in 1968 did not apply to his position as track coach.

■ None of the evidence highlighted in Dr. Hanlon's brief so destroys the basis for the district court's findings as to render them clearly erroneous. Evidence that Dr. Hanlon was originally hired as both a teacher and a coach, that he repeatedly signed similar notices of contract for both positions, and that President Haas's letter informing him of his "tenured status" did not distinguish between the two positions, does not conclusively establish that Dr. Hanlon was granted tenure as a track coach. The many portions of the 1967–68 Providence College Faculty Manual cited by Dr. Hanlon[10] hardly demand a finding that he gained tenure as a coach, or lend significant support to his assertion that coaching was an academic position for which tenure was possible.[11]

Having upheld the district court's finding that Dr. Hanlon was neither promised nor given tenure in his coaching position, we need not address Dr. Hanlon's further argument that depriving him of his position as a track coach without a hearing violated the procedures set forth in the Faculty Manual for the dismissal of tenured teachers.

4. *The Failure to Inform Dr. Hanlon of Eligibility for Promotion*

■ The last issue raised by Dr. Hanlon concerns the failure to notify him of eligibility for promotion. Dr. Hanlon testified that the Faculty Manual required such notification by the Academic Vice-President, but that he had never been notified during his fourteen years as an associate professor.

8. The Faculty Manual also states that only members of the ordinary faculty are eligible for tenure and defines members of the ordinary faculty as officers of instruction.

9. It is true that Dr. Thomson did not become Academic Vice-President until 1965 and had little familiarity with the Athletic Department, and that Father Duffy assumed the newly created position of Vice-President for Student Relations in 1969, but we do not agree with Dr. Hanlon that their testimony about the College's tenure policy was therefore irrelevant to his case.

10. *E. g.*, statements that faculty members in ranks above Instructor could achieve tenure

after seven years' service and that tenured faculty members would not have their status terminated or their teaching services discontinued except for certain reasons; a job description for the Athletic Director; and a chart showing that the Athletic Director reported to the Dean and the Academic Vice President in 1967–68.

11. In his brief, Dr. Hanlon also mentioned testimony he gave below that he marched in academic processions with the Athletic Department; we do not find this compelling evidence that coaching was an academic position for tenure purposes.

In addition, Dr. Hanlon testified that in the past three years he had appeared before the Committee on Academic Rank and Tenure at his own request, and had been denied promotion to full professor by unanimous vote. The district court found: "While failure to inform him [Dr. Hanlon] of eligibility for promotion may have technically violated the Faculty Manual, he was nonetheless considered three times for promotion."

In his brief, Dr. Hanlon responds to the district court's finding as follows:

If the court meant by "technical breach" a breach of contract which at most justified an award of nominal damages, the court failed to allow Dr. Hanlon any opportunity to submit evidence that if he had been afforded the opportunity to seek promotion he would have had an opportunity to obtain a more prestigious position and possibly a higher salary. These were proper subjects for the later hearing after the determination of liability.

We think this a curious argument, given Dr. Hanlon's testimony that he had three times sought promotion only to be refused, and his failure to request a hearing on damages below or to raise this issue in his motion for a new trial. We perceive no error.

The judgment of the district court is accordingly *affirmed*.