**Efrain Torres REYES, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 07SC658.**

Supreme Court of Colorado,
En Banc.

Nov. 3, 2008.

Walter L. Gerash Law Firm, P.C., Walter L. Gerash, James F. Scherer, Denver, Colorado, Attorneys for Petitioner.

John W. Suthers, Colorado Attorney General, Robert A. Chappell, Special Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Justice COATS delivered the Opinion of the Court.

Reyes sought review of the court of appeals' judgment in *People v. Reyes,* 179 P.3d 170 (Colo.App.2007), which affirmed his convictions on numerous criminal charges arising from a home invasion. Before trial, the district court denied his motions to dismiss for various violations of the anti-shuttling provision of the Interstate Agreement on Detainers. The court of appeals upheld that ruling, finding that Reyes effectively waived the protections of the anti-shuttling provision by either requesting or acquiescing in transfers between state and federal custody during numerous and lengthy continuances, moved for by him.

▉ By asking that he be returned to federal custody before final disposition of the charges against him, Reyes both waived the protections of the anti-shuttling statute at that time and was barred from asserting any earlier unobjected-to violations. The judgment of the court of appeals is therefore affirmed.

## I.

For his part in a 1999 home invasion in Arapahoe County, the defendant, Efrain Torres Reyes, was convicted of first degree kidnapping, sexual assault, second degree kidnapping, sexual assault on a child, first degree burglary, aggravated robbery, second degree sexual assault on a child, felony menacing, and third degree assault, for which he was sentenced to three consecutive life terms in prison, plus forty-eight years. Reyes and his accomplice were apparently looking for a large amount of money they believed to be located on the premises. Evidence indicated that the occupants of the home were beaten and terrorized, and their ten-year-old daughter was raped and sodomized by Reyes.

Reyes was arrested in 2000 in New Mexico on a federal firearms charge, for which he was ultimately convicted and sentenced to a term of forty-eight months at the federal penitentiary in Florence. In April 2001, an arrest warrant was issued in Arapahoe County, and a detainer was lodged against him by this state. During the course of the state proceedings, Reyes was produced by writ in the Arapahoe County District Court for various hearings, after a number of which he was returned to federal custody in Florence.

At his first appearance in state court in August 2002, Reyes, who was assisted by the state public defender, requested that the matter be reset to give him an opportunity to contact a private attorney who had represented him in the past. The district court reset the advisement for September 27, 2002, and with the prosecution's assurance in open court that it would "try to get the defendant back at that time," Reyes was returned to federal custody. When Reyes was brought back to Arapahoe County on September 27, he told the court that he had been unable to contact the New Mexico attorney he had in mind.

At that time, Reyes expressly requested, in open court, that he be returned to federal custody in Florence again because he would be permitted there, unlike the Arapahoe County jail, to make the long distance telephone calls necessary to arrange for private counsel. After an exchange in which Reyes was quite insistent that he be returned to federal custody, the court denied his demand but assured him that it would try to get the New Mexico attorney to contact Reyes in the Arapahoe County jail and would direct the sheriff to accept and transfer to Reyes any

calls from that attorney. Four days later, with attempts at contacting Reyes's desired attorney still unsuccessful, he again demanded in open court to be returned to federal custody. His demands were once more rejected by the district court, with express directions to the sheriff to accommodate Reyes's efforts to contact both the New Mexico attorney and a local attorney.

At a hearing on October 3, 2002, the state public defender, who was again assisting Reyes, represented that the court's directions had not been followed by the sheriff and that Reyes was asking that he be granted additional time and a transfer back to the federal penitentiary. At that point, the court granted the request to send Reyes back to Florence, and it set the matter for hearing on October 25. When Reyes returned to Arapahoe County for the October 25 hearing, still without counsel, the court finally required that his eligibility for public defender representation be evaluated, and it ordered that he not be returned to Florence for one week, during which time the district attorney agreed to contact the New Mexico attorney.

The following week, Reyes appeared before the court, again with the public defender. After receiving assessments from the district attorney and public defender concerning the likelihood that the New Mexico attorney would ever be retained, the court appointed the public defender and set the matter for preliminary hearing. To accommodate the public defender's schedule, the defense waived its right to a preliminary hearing within thirty days, and the hearing was set for January 22, 2003. At the time of his appointment and again several days later, the public defender asserted generally that the defendant was invoking all his rights, revoking any waivers, and demanding access to all physical evidence.

Later in November, Reyes was again returned to Florence; and on December 6, 2002, the local private counsel entered an appearance in place of the public defender and immediately moved to continue the preliminary hearing again. Reyes was brought back to Arapahoe County for a two-day preliminary hearing in February 2003, after which he was returned to federal custody. Reyes was again brought to Arapahoe County on May 9, 2003, to confer with counsel and be arraigned, after which he was again returned to Florence.

On June 30, 2003, Reyes filed a motion to dismiss for violation of the notification requirement of Article III of the Interstate Agreement on Detainers [1], but failed to assert any violation of the anti-shuttling provision.[2] In August, when Reyes was brought back to Arapahoe County for hearings on his motions, and argument on his IAD motion was delayed, the district court (acting through a different judge), on its own initiative, ordered that Reyes remain in state custody to avoid a possible anti-shuttling violation. One month later, when the court actually heard his Article III claim, Reyes's counsel for the first time informed the court that he intended to raise an anti-shuttling challenge, based on previous transfers between Arapahoe County and Florence. The court then ordered that Reyes be held in Arapahoe County until the motions hearing recommenced on October 8, 2003.

On October 8, Reyes's counsel filed his first anti-shuttling motion and again waived speedy trial in conjunction with a request to continue the October 20 trial date. The district court ultimately denied the defense motion to dismiss, and Reyes requested a further delay to petition for intervention by this court. His petition was eventually denied, but during the delay occasioned by it, he was once again transferred back to federal custody in Florence, resulting in a second motion to dismiss for violation of the anti-shuttling provision. Although the district court acknowledged that this final transfer violated its express order, it again denied dismissal as a remedy.

On direct appeal of his convictions, Reyes assigned error to the denial of both motions to dismiss for anti-shuttling violations. The court of appeals rejected these challenges, finding that he had waived the statute's anti-shuttling protections by requesting numerous

---

**1.** *See* § 24–60–501, art. III(b), C.R.S. (2007).

**2.** *See* § 24–60–501, art. IV(e), C.R.S. (2007).

continuances, during which he either expressly requested or acquiesced in his return to the federal penitentiary in Florence. Reyes then petitioned for further review in this court, by writ of certiorari.

## II.

■ The Interstate Agreement on Detainers is a compact, entered into by the federal government and the vast majority of states, including Colorado. *See* § 24–60–501, C.R.S. (2007). The Agreement creates uniform procedures for lodging and executing detainers on prisoners in other states to ensure that they will be held until they can be tried on outstanding charges. *Alabama v. Bozeman,* 533 U.S. 146, 148, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001). Article III of the Agreement gives a prisoner against whom a detainer has been lodged the right to request a final disposition of the relevant charges; and Article IV gives the jurisdiction in which charges remain untried the right to have the prisoner made available for trial. *Id.* at 149–50, 121 S.Ct. 2079. Once invoked, each article provides a specific, but different, time frame within which trial must be had.

For various policy reasons (which remain to some extent unclear, *see id.* at 156, 121 S.Ct. 2079), each article also contains what has come to be known as an "anti-shuttling provision," prohibiting the return of a prisoner to the sending state before completion of the trial for which he was initially transferred. In particular, Article IV(e) specifies:

> If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

§ 24–60–501, art. IV(e), C.R.S. (2007). While the Supreme Court has interpreted this language to mandate dismissal upon premature return, regardless of the brevity of the return or harmlessness of the error, it has also expressly noted that a receiving state is not barred from returning a prisoner who has waived his rights under Article IV(e). *Bozeman* at 156–57, 121 S.Ct. 2079.

In reliance on the general rule that presumes the availability of waiver, *see United States v. Mezzanatto,* 513 U.S. 196, 200–201, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), of even the most basic rights of criminal defendants, *see Peretz v. United States,* 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991); and the court's determination that the IAD contemplates a degree of party control that is consonant with the background presumption of waivability; the Supreme Court had earlier found a valid waiver of the time limits of Article III from nothing more than defense counsel's agreement to a specified delay in the trial date. *See New York v. Hill,* 528 U.S. 110, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000). Similarly, we (along with a number of other state and lower federal courts) have long held that IAD rights are nonjurisdictional and nonconstitutional and are subject to voluntary waiver, without any need for a concomitant showing that the waiver was knowing and intelligent. *See People v. Moody,* 676 P.2d 691, 695 (Colo.1984); *see, e.g., State v. Nonahal,* 241 Wis.2d 397, 626 N.W.2d 1, 4 (App.2001) (finding that IAD rights are statutory in nature and are waived if the prisoner requests a procedure inconsistent with the statute's provisions).

■ Nothing in either the statute itself or the notion of waivability generally, however, permits a prisoner to dictate the jurisdiction of his custody or location of his confinement. To the extent that the anti-shuttling provision exists for his benefit, a prisoner may waive the statute's prohibition against pre-trial return to a sending state; but by doing so, he acquires no greater right, to actually demand his return to the sending state, much less to demand his return when, only when, or only for as long as, it suits his purposes. By waiving the protections of the applicable anti-shuttling provision, a defendant merely relieves the trial court of a statutory obligation to dismiss if he is returned before trial, by which it would otherwise be bound.

■ Similarly, whether or not a defendant might also retain sufficient control to be able to expressly limit the nature or extent of an

anti-shuttling waiver, if that be his wish, nothing in the statute or the notion of waiver itself suggests that a defendant's statutory right—to remain in a receiving state until his trial—automatically springs back into effect each time he is returned to that state for further proceedings in the same prosecution. On the contrary, rather than purporting to prohibit a receiving state from returning a defendant after particular proceedings or events, the statute protects a defendant by requiring that the prosecution against him be dismissed upon his return to the sending state, at any point in time prior to his trial. By voluntarily requesting that he be returned before his trial, without more, a defendant does not simply waive his right to assert a violation of the statute for a particular transfer; he waives the statutory protection against premature return and its mandatory sanction of dismissal.

█ Finally, while nothing in the statute or the concept of waiver itself precludes the subsequent revocation, or withdrawal, of a waiver of the anti-shuttling provision, even waivers of fundamental trial rights are typically not subject to revocation as a matter of right. *See* Crim.P. 23(6) (prohibiting defendant from withdrawing voluntary and knowing waiver of jury trial as a matter of right, and allowing it only with permission of court); *People v. Price,* 903 P.2d 1190, 1192–93 (Colo.App.1995), *cert. denied* (holding that court is not compelled to grant criminal defendant's request to withdraw valid waiver of right to counsel); *Sewell v. Jefferson County Fiscal Ct.,* 863 F.2d 461, 466 (6th Cir.1988)(relying on *Hanlon v. Providence Coll.,* 615 F.2d 535, 538–39 (1st Cir.1980) for proposition that party withdrawing right to jury trial may not simply change his mind); *Gen. Bus. Servs., Inc. v. Fletcher,* 435 F.2d 863, 864 (4th Cir.1970); *State v. Gallegos,* 147 P.3d 473, 476–77 (Utah Ct.App.2006) (holding that mid-trial appointment of counsel after valid waiver by competent defendant is within discretion of court); *State v. Vincent,* 137 N.M. 462, 112 P.3d 1119, 1133 (Ct.App.2005) (holding that assistance of counsel may not be demanded as matter of right after a valid waiver); *see generally* H.H. Henry, Annotation, *Withdrawal or Disregard of Jury Trial in Civil Action,* 64 A.L.R.2d 506, 517–19

(1959) ("The rule recognized in a number of cases is that once a waiver of jury trial has matured, the waiver may not be withdrawn at the insistence of one party."). If for no other reasons than scheduling and orderly administration of the proceedings, once a right has been effectively waived, that waiver can be revoked and the waived right reclaimed only in the discretion of the court. Whether or not a court might, under some set of circumstances, be held to have abused its discretion in refusing to permit a defendant to reclaim the protections of the anti-shuttling provision, it is enough here that such an abuse could not occur in the complete absence of a motion to revoke the defendant's prior waiver and an adverse ruling by the court.

At least by September 27, 2002, when Reyes was brought to the Arapahoe County District Court for the second time, it is undisputed that he not only requested, but in fact demanded, to be returned to Florence, rather than remain in the Arapahoe County jail. Over the next nine months, he was brought to state court and returned to federal custody frequently and, on a number of occasions, at his own insistence. He failed to object or allege a violation of the anti-shuttling provision until more than a year later, on October 8, 2003.

The defendant, even arguably, attempted to revoke his earlier waivers on only one occasion. When the public defender was briefly appointed to represent him, counsel asserted generally that the defendant was invoking all of his rights, revoking any waivers, and demanding access to all physical evidence. Nothing in this general assertion suggested to the court an intent to revoke the defendant's anti-shuttling waiver, nor did defense counsel object to the return of his client to federal custody thereafter or seek an exercise of the court's discretion in this regard. When the defendant finally moved for dismissal on October 8, he alleged that the earlier returns were done without specific waivers on each occasion, but he never moved to revoke his prior waivers; and although the district court had by then ordered that the defendant remain in state custody to ensure against a possible future anti-shut-

tling violation, it never exercised its discretion to permit him to revoke any prior waiver or reclaim the statutory protection that he earlier waived.

When Reyes was returned to federal custody for the second time, on October 3, 2002, he was returned at his own insistence. His voluntary waiver of the IAD's anti-shuttling provision at that time waived his statutory right to dismissal for any further return, unless or until he was permitted to revoke that waiver. The district court never granted a motion to revoke the defendant's prior waiver because no such motion was ever made.

### III.

Arguably, Reyes also waived the protection of the IAD's anti-shuttling provision at his first appearance in state court, even though the record does not reflect an express request to be returned to federal custody at that time. He was returned to Florence following his first appearance only upon his own request for more time to contact and retain an attorney who had represented him in the past and only upon the assurance of the prosecutor, in open court, that he would try to have the defendant returned for the rescheduled advisement date. Whether or not a defendant's request and acceptance of a continuance under these circumstances could amount to a voluntary waiver of the anti-shuttling provision, it is enough here that Reyes' subsequent express waiver, prior to any objection to his return, was sufficient to bar him from asserting any prior violation.

■ Whatever the precise rationale that led the signatories to agree to Article IV(e)'s anti-shuttling provision, see *Bozeman*, 533 U.S. at 154–46, 121 S.Ct. 2079, it clearly dove-tails with the article's requirement for speedy disposition, once a receiving state invokes its statutory prerogatives. Like Article IV's 120–day time limitation on bringing a defendant to trial, its anti-shuttling protections may be waived by a voluntary act with which they are inconsistent. See *Bozeman*, 533 U.S. at 152–53, 121 S.Ct. 2079; 156–57 (analogizing waiver of anti-shuttling provision to waiver of article III's speedy trial provision in *Hill*, 528 U.S. at 114–15, 120 S.Ct.

659); see also *Moody*, 676 P.2d at 695 (holding that waiver need only be voluntary); see *Nonahal*, 626 N.W.2d at 4 (holding anti-shuttling provision waived by requesting "a procedure inconsistent with the statute's provisions"). In this jurisdiction, we have long held that requesting a further continuance is an affirmative action constituting a waiver of whatever right to discharge for a prior speedy trial violation a defendant may have had at the time. See *Keller v. People*, 153 Colo. 590, 596, 387 P.2d 421, 425 (1963); see also *State v. Dumas*, 68 Ohio App.3d 174, 587 N.E.2d 932, 933–35 (1990) (concurring in prosecutor's request for continuance after speedy trial violation waived ability to challenge violation); cf. § 18–1–405, C.R.S. (2007) (codifying aspects of this principle generally by specifying that assertion of speedy trial violation is waived unless raised before trial, pre-trial motions, or guilty pleas).

The anti-shuttling provision protects a defendant by entitling him to remain in the receiving state, rather than being returned to the sending state prior to trial. A request to be returned to the sending state, made any time before trial, clearly waives that protection. If a defendant prefers to be returned to the custody of the sending state pending trial, he may of course waive his right to dismissal for a premature return and request such a transfer; but in doing so, he takes an affirmative action in direct conflict with his right to remain in the receiving state pending trial. Whether or not the defendant might otherwise have been entitled to dismissal for deprivation of that right, his subsequent waiver of the protections of the statute also waives his right to initially assert a previous violation.

### IV.

By requesting that he be returned to federal custody before final disposition of the charges against him, the defendant not only waived the protections of the anti-shuttling statute at that time but also was barred from asserting any earlier unobjected-to returns. The judgment of the court of appeals is therefore affirmed.

Justice BENDER dissents, and Chief Justice MULLARKEY and Justice MARTINEZ. join in the dissent.

Justice BENDER, dissenting.

The majority concludes that, under the Interstate Agreement on Detainers ("IAD"), a defendant who requests a transfer back to the sending state on a one-time basis and for the limited purpose of securing the counsel of his choosing, thereby waives any violations of the IAD arising from transfers prior to the requested transfer. Maj. op. at 663, 665–66, 667. Moreover, the majority concludes that, after a waiver as to a single transfer has been made, the defendant may thereafter be shuttled back and forth between the receiving and sending states indefinitely, even though the defendant has neither requested nor consented to these subsequent transfers. Maj. op. at 663, 665–66. The majority also concludes that when a defendant's motion to continue the trial is granted by the trial court in the receiving state, the defendant waives, both retroactively and prospectively, his rights, not only under the speedy trial provision of article IV of the IAD, but under the no return provision of that article as well. Maj. op. at 666–67.

The majority introduces the concept of retroactive waiver into the IAD for the first time. Cases of other jurisdictions construing the IAD do not support this new concept. The majority concludes that the types of defendant conduct constituting a waiver of the protections of article IV, the right to trial within 120 days after arrival in the receiving jurisdiction and the right not to be returned to the sending state before trial on the outstanding charges, are identical. This conclusion conflates the distinct nature of these two rights. Finally, the majority contravenes the express statutory command of article IX of the IAD that the "agreement shall be construed liberally so as to effectuate its purposes." The purposes of the no return provision include: (1) encouraging expedited resolution of outstanding charges against the prisoner by requiring that the receiving state bear the expense of housing the prisoner prior to trial, and (2) protecting the prisoner from prosecutorial abuse of the

simplified detainer system by lodging groundless and bad-faith detainers.

Recently, the United States Supreme Court held that article IV(e) is to be interpreted strictly and literally to require dismissal of criminal charges when a prisoner's right of no return is violated. *Alabama v. Bozeman*, 533 U.S. 146, 155, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001) (holding that no de minimis exception to article IV(e) exists, and, therefore, a transfer for even one day violates the agreement). Although this is a relatively new case and Congress may change this construction of article IV(e), I feel compelled to apply the Court's mandate and respectfully dissent.

**I.**

The IAD creates uniform procedures for lodging and executing detainers. *Bozeman*, 533 U.S. at 146, 121 S.Ct. 2079. A detainer is a legal order that requires a state to hold a currently imprisoned individual when he has finished serving his sentence so that another state may try him for a different crime. *Id.* "The Agreement attempts to remedy the disadvantages and hardships imposed upon prisoners attendant with the use of detainers and to eliminate potential abuses of the detainer system." *United States v. Dixon*, 592 F.2d 329, 333 (6th Cir.1979). The central provisions of the IAD are articles III and IV. *Id.* at 334. Article III sets forth the procedure by which a prisoner against whom a detainer has been lodged can demand speedy disposition of the charges giving rise to the detainer. *Id.* Article IV provides a means by which a prosecutor who has lodged a detainer against a prisoner in another jurisdiction can secure temporary custody of that prisoner for the disposition of outstanding charges. *Id.*

Article IV of the IAD grants two separate rights to a prisoner of one state against whom a detainer is lodged by another state. § 24-60-501, art. IV, C.R.S. (2008). These rights are triggered by the charging jurisdiction's request for temporary custody of the prisoner for the purpose of resolving the charges pending against him. *Id.* Article IV(c) provides that "trial shall be commenced within one hundred twenty days of the arriv-

al of the prisoner in the receiving state." Article IV(e), referred to by the Supreme Court as the "no return provision," grants a different right to the prisoner:

If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's return to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

It is article IV(e), the no return provision, that is in issue in this case, and not article IV(c)'s speedy trial provision.

Also relevant to the disposition of this case is article IX, which provides that the "agreement shall be construed liberally so as to effectuate its purposes." The IAD is a federal law subject to federal construction, and we are bound by the decisions of the United States Supreme Court. *Bozeman*, 533 U.S. at 149, 121 S.Ct. 2079.

With this background in mind, I review some of the facts relevant to this case.

## II.

The record reveals that, while the defendant was transferred from state custody to federal custody six times, only one of those transfers was made at his request. Most importantly, the defendant made his requests for this particular transfer solely for the purpose of contacting his attorney in another state. His request for transfer was necessitated by the jail's failure to obey the trial court's order directing the jail staff to allow the defendant phone access to retain counsel. On November 1, 2002, however, counsel was appointed to represent the defendant, and, therefore, he made no further requests to be returned to the federal penitentiary in Florence, Colorado ("USP–Florence") after that date. Nonetheless, the trial court transferred the defendant four more times after November 1. Moreover, the very first transfer of the defendant from state custody back to federal custody occurred on August 28, 2002, before the defendant's first request for a transfer on September 27, 2002. Thus, as the facts establish, the defendant was transferred five times despite not having requested those transfers.

After sentencing on federal criminal charges, the defendant was incarcerated at USP–Florence. While the defendant was serving his federal sentence, Arapahoe County lodged a detainer with federal authorities against him. Because the defendant was serving his federal sentence at the time it was lodged, the protections of the IAD were triggered.

The defendant was first transported to Arapahoe County on August 27, 2002, one day before his first appearance in district court. At this hearing, the defendant requested a trial continuance, which the court granted, but he did not ask to be remanded to USP–Florence. The trial court nevertheless remanded the defendant to USP–Florence.

Approximately one month later, the defendant was again transported to Arapahoe County on September 25, 2002, for appearances in district court on September 27, October 1, and October 3. At the first of these appearances, the defendant stated that he had been unable to contact his New Mexico attorney because the Arapahoe County jail did not have long distance service. He requested return to USP–Florence, so that he would be able to call the New Mexico attorney. The court denied this request. Instead, the court ordered the district attorney to call the New Mexico attorney to be sure that he intended to represent the defendant. The court further directed the sheriff to advise the jail staff to expect a call from New Mexico and to allow the defendant to receive the call.

At the next appearance, on October 1, 2002, the defendant requested transfer back to USP–Florence because the county jail was not permitting him to make phone calls freely. Once again, this request was denied, but the trial judge ordered that the defendant be permitted to make local phone calls in order to obtain local counsel. Finally, on October 3, the defendant informed the court that he was still not being permitted to make local phone calls, and that the jail was not complying with the court's earlier order of October

1. At this hearing, the sheriff explained that a mistake had been made and the defendant had inadvertently been denied phone access. The defendant reiterated his request to be transferred to USP–Florence for the purpose of retaining counsel. The trial court granted the request and the defendant was remanded to USP–Florence on October 6, 2002.

The defendant was transferred back to Arapahoe County in late October and, at a hearing on November 1, 2002, the trial court appointed the public defender to represent the defendant after determining that private counsel was not forthcoming. The public defender purported to revoke all prior waivers of rights made by the defendant. At this point, because retaining private counsel was no longer an issue, the defendant made no further requests for transfer.

Nevertheless, the defendant was returned to USP–Florence four additional times over a period of twenty three months. He was transferred from state to federal custody on November 5, 2002. Again, four months later, on March 4, 2003, he was transferred to state custody and returned to USP–Florence. Again, a month and a half later, he was transferred from state to federal custody on May 14, 2003. And again, almost seventeen months later, he was transferred back to USP–Florence on October 7, 2004. This last transfer occurred after the defendant objected to further transfer by filing his first motion to dismiss the charges for violation of his rights under the IAD; apparently, this transfer occurred as the result of an "administrative error." None of these four most recent transfers benefited the defendant in any way. They were not made for the purpose of allowing the defendant to obtain counsel or to enable him to prepare for trial.

### III.

A defendant may waive his rights under the IAD because the agreement's protections exist for his benefit. *See New York v. Hill,* 528 U.S. 110, 116, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000) (quoting *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296 (1945)); *State v. Vinson,* 182 S.W.3d 709, 712 (Mo.Ct.App.2006)("The [no return provision] ... is thus for [the defen-

dant's] benefit and is waivable."). Courts have generally agreed that waiver occurs under the IAD when the prisoner requests to be treated in a manner inconsistent with the protections of the particular provision of the agreement at issue. *Hill,* 528 U.S. at 114, 120 S.Ct. 659 (collecting cases). In the context of the no return provision, a request by the prisoner to be transferred back to the sending state has been held repeatedly to be the type of "inconsistent" conduct that constitutes waiver. *See, e.g., Webb v. Keohane,* 804 F.2d 413, 415 (7th Cir.1986); *U.S. v. Black,* 609 F.2d 1330, 1334 (9th Cir.1979); *United States v. Eaddy,* 595 F.2d 341, 344 (6th Cir.1979); *Vinson,* 182 S.W.3d at 712; *State v. Hill,* 638 So.2d 1376, 1379–80 (Ala. Crim.App.1993); *People v. Browning,* 104 Mich.App. 741, 306 N.W.2d 326, 334–35 (1981). The Supreme Court has suggested that a receiving state might be permitted to transfer a prisoner back to the sending state before trial "when it would be mutually advantageous and the prisoner accordingly waives his rights under Article IV(e)." *Bozeman,* 533 U.S. at 157, 121 S.Ct. 2079. However, when a transfer back to the sending state before trial occurs and is neither requested by the prisoner nor made for his benefit, the IAD requires dismissal of the charges. *Id.* at 155–56, 121 S.Ct. 2079; *Browning* 306 N.W.2d at 335 ("Where the transfer back is not done at the request of defendant or his attorney, we believe that the state should be charged with the responsibility therefore.").

In this case, the defendant was returned from state custody to federal custody five separate times without his consent, express or implied. The defendant's request to be remanded to USP–Florence was for the limited purpose of retaining counsel because he was denied the ability to communicate with counsel by the receiving state, Colorado. This request came after the initial transfer on August 27, 2002, which was made, again, at the trial court's initiative, not the defendant's. After the appointment of counsel, he was transferred four additional times over a period of twenty-three months. As of November 1, 2002, the defendant's need to retain counsel was no longer a concern and so

the four transfers that occurred after that date were made neither for the defendant's benefit nor at his request. Indeed, the record discloses that the most recent of these transfers, which occurred almost two years after the appointment of counsel, was made as the result of an "administrative error." Our lower courts have held, and I agree, that "the purpose of the [IAD] requires that the adverse consequences of official oversights be visited upon the prosecution, not upon the prisoner." *People v. Lincoln,* 42 Colo.App. 512, 601 P.2d 641, 644 (1979).

The majority holds that the first transfer, which occurred on August 27, 2002, did not violate the IAD because the defendant waived his right to challenge this particular transfer. The defendant did not request the transfer, nor does the record indicate any ostensible benefit which accrued to the defendant as a result of the transfer. It is unclear to me precisely what conduct the majority argues constituted a waiver of this first violation: the defendant's subsequent request for transfer, which was not made until one month after this transfer, maj. op. at 665–66, 666, 667, or his request for a continuance of the trial made at that first hearing, maj. op. at 666–67. I therefore address each of these arguments below.

### A.

With respect to the retroactive theory of waiver, the majority concludes that the defendant's requests for transfer, which occurred later in time, on September 27, October 1 and October 3, effectively waived his unilateral transfer on August 27, even though he made no request for transfer at that time. The majority fails to cite any authority for the proposition that a violation of the IAD may be waived retroactively, that is, after the violation has already occurred. Maj. op at 665–66, 666, 667.

There exists, however, authority for the contrary proposition, at least in the context of article III's speedy trial provision. *Monroe v. State,* 978 So.2d 177, 183 (Fla.Dist.Ct. App.2007); *State v. Smith,* 686 S.W.2d 543, 549 (Mo.Ct.App.1985); *State v. Mason,* 90 N.J.Super. 464, 218 A.2d 158, 163 (App.Div. 1966); *Commonwealth v. Mayle,* 780 A.2d

677, 683 (Pa.Super.Ct.2001). In these cases, the various jurisdictions held that a defendant could not validly waive his rights under the IAD after the statute's speedy trial time had expired. In *Monroe,* for example, the court held that, even though the defendant had expressly agreed to waive his speedy trial rights on various occasions, he was entitled to discharge since these "waivers" were made after the 180–day period had expired and the violation had already occurred. 978 So.2d at 183. Thus, the case law indicates that courts have been unwilling to recognize retroactive waivers of speedy trial rights under the IAD.

I can find no compelling reason to reject this trend in the context of the right of no return under article IV(e). While, as I explain below, I recognize that speedy trial and no return rights should not be conflated in terms of the conduct required to waive each, the inconsistent conduct analysis of *Hill* provides no basis for holding that retroactive waiver is inconsistent with speedy trial rights but consistent with no return rights. Therefore, I conclude that the defendant's subsequent request to transfer back to the sending state could not remedy the first violation of IV(e) that occurred here.

### B.

The majority also states that, "arguably," the defendant acted inconsistently with the no return protection of article IV(e) by moving for a trial continuance which was granted, and therefore waived his right not to be returned to the sending state before trial. Maj. op. at 666–67. This holding conflates the concept of waiver under the no return provision, IV(e), with waiver under the speedy trial provision, IV(c).

While it is true that rights under the IAD may be waived, "[w]hat suffices for waiver depends on the nature of the right at issue." *Hill,* 528 U.S. at 114, 120 S.Ct. 659. As mentioned, other jurisdictions have held that IAD rights may be waived if the defendant takes actions inconsistent with the particular right. *Id.* (collecting cases). This formulation has been cited with approval by the Supreme Court. *Id.* Under *Hill,* the particu-

lar type of conduct that will be "inconsistent" will depend on the nature of the right at issue.

In the context of the speedy trial provision of IV(c), the particular inconsistent conduct giving rise to waiver has been held to include a defendant's motion for a continuance of the trial. *Reed v. Farley,* 512 U.S. 339, 353, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994); *see also Hill,* 528 U.S. at 115, 120 S.Ct. 659 (finding waiver in the context of article III's 180–day speedy trial requirement). This rule makes sense. Requesting that trial be delayed is logically inconsistent with demanding that it occur speedily and within the statutory time frame. As mentioned, other jurisdictions have held that a defendant may waive his rights under IV(e)'s no return provision by requesting a transfer to the sending state. Again, these actions are logically inconsistent with the protections afforded by the specific provision: a request to be transferred is inconsistent with the right not to be transferred.[1]

The majority conflates these two provisions, articles IV(c) and IV(e), and the kinds of conduct required to waive their protections. It holds that a defendant who requests a continuance, conduct that is not inconsistent with the right granted by IV(e) to remain in the receiving state, waives not only his speedy trial rights, but his no return rights as well. While requesting a continuance is inconsistent with the speedy trial rights of the IAD, nothing in the nature of the request for a trial continuance itself is inconsistent with the right to remain in the receiving state until trial.

The majority finds support for the proposition that a waiver of article IV(c) speedy trial rights constitutes a waiver of article IV(e) no

return rights by relying upon dictum in *Bozeman* that cites *Hill,* which addressed speedy trial rights under article III:

> Although we reject Alabama's interpretation of the Agreement, our decision does not bar a receiving State from returning a prisoner when it would be mutually advantageous and the prisoner accordingly waives his rights under Article IV(e). *Cf. Hill,* 528 U.S. at 114–115[, 120 S.Ct. 659] (holding that a defendant may waive his rights *under Art. III of the Agreement* ).

533 U.S. at 157, 121 S.Ct. 2079 (emphasis added). The majority argues that by citing *Hill* in the context of a general discussion of waiver, *Bozeman* analogizes the manner in which no return rights may be waived to the manner in which speedy trial rights under article IV may be waived. Maj. op at 667. I disagree that this statement in *Bozeman* and reference to *Hill* analogizes waivers of article IV(c) rights to waivers of article IV(e) rights. *Hill,* an article III case, is cited in *Bozeman* for the general proposition that IAD rights may be waived by inconsistent conduct, and not for the proposition that the manner in which no return rights and speedy trial rights are waived is identical. *Id.* To the contrary, *Hill* states that "[w]hat suffices for waiver depends on the nature of the right at issue." 528 U.S. at 114, 120 S.Ct. 659. Hence, the majority's construction of the manner in which the two distinct article IV rights may be waived, that the waiver of one also waives the other, contravenes the only case it relies on for support.

### IV.

I now turn to the four transfers that occurred after November 1, 2002, after counsel

---

1. This reasoning has been echoed by other courts, and most explicitly by *Browning,* 306 N.W.2d at 335. Citing *Eaddy,* 595 F.2d at 344, and *Gray v. Benson,* 443 F.Supp. 1284 (D.Kan. 1978), *Browning* examined the concept of waiver in the article IV context and distinguished the manner in which the separate and distinct speedy trial and no return rights might be waived:

   > [I]t is not difficult to accept that the right to trial before return might be waived by a prisoner whose priorities require a return before trial. Similarly, the right to trial within a certain number of days may likewise be

   waived, for reasons which are similarly high on the prisoner's priorities. Certainly, our own 180–day rule may be impliedly waived by the defendant if the case stands ready for trial within that time, but the "defendant's delaying motions" cause a sufficient delay to preclude trial from commencing before the end of that period.

   306 N.W.2d at 335 (internal citations omitted). Significantly, the *Browning* court concluded that the fact that the defendant had waived his speedy trial rights under article III and under article IV(c) was not determinative of whether he had waived his article IV(e) no return rights. *Id.*

was appointed to represent the defendant. The majority excuses these violations of article IV(e) of the IAD by holding, without citing authority, that the defendant's request for a transfer for the limited purpose of securing the counsel of his choosing acted as an absolute waiver of his right to refuse all subsequent non-consensual transfers, irrespective of how many times these transfers might occur. Maj. op. at 663, 665–66. Here, the majority holds that the waiver lasted for over two years.

The majority's decision allows a waiver made on a one-time basis and for a limited purpose to continue indefinitely, for the lifetime of pre-trial proceedings. It holds that a limited, one-time waiver excuses all transfers, whether consensual or not, for potentially years on end. This contravenes the purposes of the IAD as stated by the Supreme Court and the various federal circuit courts of appeal, and violates article IX's command that the "agreement shall be construed liberally so as to effectuate its purposes."

The majority suggests that the purposes for which Congress enacted the no return provision of article IV(e) are unclear. Maj. op. at 665. I disagree. The Supreme Court and several federal circuit courts of appeal have articulated at least two purposes of Article IV(e) with which the majority's holding is at odds: (1) encouraging expedited resolution of outstanding charges against the prisoner by requiring that the receiving state bear the expense of housing the prisoner prior to trial; and (2) protecting the prisoner from prosecutorial abuse of the simplified detainer system by lodging groundless and bad-faith detainers. *Bozeman*, 533 U.S. at 154, 121 S.Ct. 2079; *Dixon*, 592 F.2d at 336.

In *Bozeman*, the Court explained that "the purpose of the 'no return' provision cannot be ... a simple, direct effort to prevent the interruption of rehabilitation." 533 U.S. at 154, 121 S.Ct. 2079. Instead,

> [t]he agreement not only prevents "return," but it also requires the receiving State to pay for the prisoner's incarceration in that State during the period prior to trial ... That requirement may provide the receiving State with an incentive to shorten the pretrial period—to proceed to

trial faster than 120 days or not to seek extensions—thus disposing of detainers, and the attendant "uncertainties which obstruct programs of prisoner treatment and rehabilitation," in the most "expeditious" manner.

*Id.* at 155, 121 S.Ct. 2079 (quoting 18 U.S.C.A. § 2 art. I). If the receiving state could use a one-time request for transfer as an excuse to shuttle the prisoner back and forth to the sending state indefinitely, then the state would be able to circumvent one of the primary purposes of article IV(e): encouraging expeditious resolution of pending charges by requiring the receiving state to bear the expense of housing the prisoner. This is precisely what happened here. By transferring the defendant back to USP–Florence on these four occasions, Colorado saved itself the expense of housing the defendant for non-trivial periods of time during an extensive pretrial period.

*Dixon* illustrates another purpose Congress had in mind when it adopted IV(e): preventing prosecutorial abuse of the IAD's simplified detainer system. 592 F.2d at 336. Again, IV(e) forces the receiving state to bear the burden of housing the prisoner prior to trial in order to achieve its aims, which, as *Dixon* points out, include discouraging the lodging of frivolous or bad faith detainers. To treat a request for a one-time transfer as a license to prosecutors to transfer prisoners without restraint effectively bypasses the financial deterrent on prosecutorial misconduct article IV(e) was designed to impose.

Finally, the majority claims that nothing in the statute suggests that a defendant's IV(e) right not to be transferred to the sending state prior to trial "springs back into effect each time he is returned to that state for further proceedings in the same prosecution." Maj. op. at 665–66. There appears to be no authority directly on point either way. However, the few jurisdictions that have even obliquely addressed this issue have all indicated a willingness to treat each transfer separately. *See, e.g., Black*, 609 F.2d at 1334 (defendant alleged that the government violated the IAD's no return provisions; the court noted that the defendant was returned to the sending state's custody on three sepa-

rate occasions, but that "[o]n each occasion he requested the return."). Likewise, the Supreme Court suggested as much in *Bozeman:* "[E]very prisoner arrival in the receiving State, whether followed by a very brief stay or a very long stay in the receiving State, triggers IV(e)'s 'no return' requirement." 533 U.S. at 154, 121 S.Ct. 2079 (emphasis in original).

I am authorized to state Chief Justice MULLARKEY and Justice MARTINEZ join in this dissent.